# United States Court of Appeals
## For the First Circuit

No. 01-1642

KELLY A. GILLEN,

Plaintiff, Appellant,

v.

FALLON AMBULANCE SERVICE, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge]
[Hon. Lawrence P. Cohen, U.S. Magistrate Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Saris,* District Judge.

William J. McLeod, with whom McLeod & Associates was on brief, for appellant.
Wilfred J. Benoit, Jr., with whom Wilfred J. Benoit, Jr., P.C., Heidi Goldstein Shepherd, and Goodwin Procter LLP were on brief, for appellee.

March 19, 2002

**SELYA, <u>Circuit Judge</u>.** Plaintiff-appellant Kelly A. Gillen, a genetic amputee with only one completely functioning arm, sued defendant-appellee Fallon Ambulance Service, Inc. (FAS) for refusing to hire her as an emergency medical technician (EMT). The court below granted summary judgment, reasoning that the appellant did not have a disability within the meaning of the relevant statutes, and that, in all events, she could not have performed the essential functions of the job. Gillen's appeal raises nuanced questions under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213. After pondering these questions, we vacate the judgment and remand for further proceedings.

## I. BACKGROUND

Consistent with the conventional summary judgment praxis, we recount the facts in the light most hospitable to the appellant's theory of the case, consistent with record support. <u>C.K. Smith & Co.</u> v. <u>Motiva Enters.</u>, 269 F.3d 70, 72 (1st Cir. 2001).

The appellant was born with a deformed left arm — the limb ends a few inches below the elbow — but her courage and perseverance are not open to question. Although she eschews the use of a prosthesis, she performed impeccably in a myriad of jobs (e.g., sales clerk in a department store, laboratory

-3-

assistant) during her high school and college years. Aspiring to become a physician, she decided, as an interim step after obtaining a bachelor's degree, to seek employment as an EMT.

This was easier said than done. The duties of an EMT involve substantial physical prowess. An EMT usually works as part of a two-person team. The team typically responds to a call for assistance, assesses the patient's condition on the scene, administers basic medical care, and then transports the patient to an appropriate health care facility. The transport is customarily effected by placing the patient on a stretcher or stair chair, which then must be lifted and carried to an ambulance, sometimes down several flights of stairs. The EMTs then load the patient into the ambulance, drive to the health care facility, and unload. Given the rigors of this work, it is unsurprising that the Massachusetts Department of Public Health (MDPH) requires that an EMT "[b]e free of any physical or mental impairment or disease which could reasonably be expected to impair [her abilities], or which could reasonably be expected to jeopardize the health and safety of the patient." Mass. Regs. Code tit. 105, § 170.910(A)(3).

Once she set her sights on obtaining employment as an EMT, the appellant enrolled in a preparatory course. After logging 110 hours of course work (including both academic and

clinical components), she took and passed the state certification examination — an examination composed of both written and practical portions. Id. § 170.910(A)(5). She received her certificate in the fall of 1997.

In search of work, the appellant contacted FAS on December 7, 1997. She filled out an application form that included questions about her physical condition and required her to authorize the release of medical and workers' compensation records.[1] Tim Royer, an FAS hierarch, interviewed her a few weeks later. She filled out more forms.

Paul Fallon, FAS's vice-president of operations, conducted a second interview on January 2, 1998. He queried the appellant about the origins of her deformity, expressed skepticism about her ability to perform certain physical tasks (especially lifting), and voiced concern about possible liability should the appellant prove unable to hoist patients properly. Despite these reservations, Fallon offered her

---

[1]These materials were used by FAS, at the time, to screen out prospective employees who might be susceptible to injury on the job. FAS has now removed all questions about physical deformities and workers' compensation from its standard application form.

employment as an EMT, conditional upon passing a physical examination administered by the Milton Hospital.[2]

Milton Hospital has had a longstanding relationship with FAS, serving as the principal provider of employment-related health care to FAS's work force. As part of this relationship, the hospital, through its occupational health clinic, was in the process of helping FAS establish a compendium of the physical attributes required for doing EMT work. This list, intended for use as a baseline by physicians who examined candidates for vacant EMT positions, included the following "essential job functions:"

- Lifting with two hands individually up to 70 pounds for a total height of 6 inches from knuckle height occasionally. Lifting with one hand individually up to 20 pounds from a height of 0 inches to 48 inches frequently.

- With a partner lifting a stretcher with a client on it weighing from 75 pounds to 300 pounds from a height of 6 inches to 40 inches occasionally.

In another part of this same document, the catalogue of "minimal job requirements" included two-handed lifting of 70 pounds from

---

[2]Fallon also offered the appellant the less taxing position of chair car driver. The appellant declined, declaring that she was interested only in an EMT position.

0-4 times a day,[3] a one-handed lift of 20 pounds 0-40 times a day, and lifting (with a partner) 75-300 pounds 0-40 times a day.

On January 8, 1998, the appellant repaired to Milton Hospital for her medical examination. The examiner, Dr. Asif Qazi, did not have the list of essential job functions with him at the time, but he knew that the EMT position involved heavy lifting and lifting in difficult positions. He worried that the appellant might not be able to perform the lifting functions effectively. He therefore decided that a further review of her strength and ability to lift were in order before he could give her a clean bill of health. In Dr. Qazi's view, the results of this later testing would not only document the appellant's raw strength but also shed light upon her lifting mechanics (e.g., her ability to keep a patient properly balanced aboard a stretcher).[4]

Dr. Qazi informed the appellant of his conclusion, and she immediately called an FAS official, Christine Hamilton, to

_____

[3]Fallon testified without contradiction that "0-4 times a day" was an error, and that the requirement instead should read "0-40 times a day."

[4]The paperwork that Dr. Qazi completed roughly tracked this conclusion. In his report, the physician placed a checkmark next to "[n]o medical contraindication to performing this job, with the following recommended accommodations or job training," and then added: "To be determined by strength test."

make arrangements for the strength test.  Later that day, however, Dr. Qazi discussed the situation with his immediate superior, Dr. Thomas Winters.  Dr. Winters, who had vast expertise in both emergency medicine and occupational health matters, served as the medical director of Milton Hospital's occupational health clinic.  After Dr. Qazi described the appellant as a genetic amputee whose left arm was missing below the elbow, Dr. Winters replied that, in his opinion, she could not perform the essential functions of the EMT position (and, thus, could not pass the preemployment examination).

Dr. Winters premised his opinion in part on a fear that the appellant could not serve as an EMT without jeopardizing patients and coworkers.  He explained that, based on his experience, one of the most important duties of an EMT was to stabilize a patient after an accident, and, given the appellant's impairment, she would be unable (even with a partner) effectively to perform the difficult balancing required when transporting patients from tight spaces or difficult-to-reach sites.  Moreover, Dr. Winters did not believe that the appellant's grasping technique, as described to him by Dr. Qazi, could work in lifting a stretcher (with a partner) when the patient weighed over 150 pounds.  Given these problems, Dr. Winters considered further testing of the appellant's strength

or lifting mechanics unnecessary and, with Dr. Qazi's acquiescence, determined that the appellant had failed the preemployment examination.

Dr. Winters called Fallon and informed him of this determination. He also compiled a report. Like Dr. Qazi, see supra note 4, he placed a checkmark in the box next to "[n]o medical contraindication to performing this job, with the following recommended accommodations or job training," but underneath he wrote, "can perform all essential job functions of EMT except: — 2 handed lift independent or with partner."

On January 14, 1998, Fallon told the appellant that Dr. Winters had reviewed her file and refused to pass her because she could not perform two-handed lifting. The appellant expressed dismay that a doctor who had never seen her could determine that she was unable to do the lifting necessary for the EMT position, and soon filed a charge of disability discrimination with the Massachusetts Commission Against Discrimination (MCAD). FAS answered the MCAD complaint and identified the appellant's inability to perform two-handed lifts as "the sole reason" why she was not hired. FAS further alleged that it had relied on the advice of Milton Hospital in determining that the appellant was unable to perform an

essential job function (and, thus, in rejecting the appellant's application).

On April 13, 1998, FAS's attorney wrote to the appellant's counsel stating that FAS still would be willing to hire the appellant if she could demonstrate how, with or without reasonable accommodation, she could perform the essential job function of two-handed lifting. In that letter, FAS made clear that it regarded the appellant as "otherwise qualified for the job." The appellant did not respond to this offer.

In the meantime, the appellant applied for an EMT position with American Medical Response (AMR). AMR agreed to hire her on the condition that she pass a strength test. One portion of this test required that the appellant lift ninety pounds to knuckle height with her one functioning arm. At first, the appellant could not satisfy this requirement. She began a weightlifting regimen and, a few weeks later, passed the strength test. AMR hired her as a part-time EMT in April 1998. Three months later, the appellant accepted a full-time EMT position with Boston Emergency Medical Services (BEMS). She has performed that job successfully without any special accommodations.

On May 29, 1998, the appellant forsook the MCAD and brought suit in the United States District Court for the

District of Massachusetts. She alleged, inter alia, violations of the ADA and its state counterpart, Mass. Gen. Laws ch. 151B, § 4. At the close of discovery, FAS moved for summary judgment. The appellant resisted the motion. The district court referred the matter to a magistrate judge. After expressing doubt about whether lifting could be considered a "major life activity," the magistrate judge concluded that the appellant was not substantially limited in this activity because she could lift at least forty to fifty pounds at the time that she applied for work with FAS (and, moreover, she had stated in her deposition that she could do whatever she desired without an accommodation of any kind). Finding the appellant not disabled, the magistrate judge recommended the entry of summary judgment in FAS's favor. The appellant objected to the recommendation.

The district court overruled the objection and granted FAS's motion for brevis disposition. The court accepted the reasoning set forth in the magistrate judge's report and recommendation, and added a further ground: that the appellant was not qualified for the position when she applied to FAS because she was unable to lift sufficient weight to enable her to perform essential job functions. This timely appeal followed.

II. DISCUSSION

As we approach the merits of this appeal, we are mindful that summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Our review of a district court's grant of summary judgment is plenary. N. Am. Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 37 (1st Cir. 2001).

We are mindful, too, that the ADA was designed to eliminate discrimination against individuals with disabilities. 42 U.S.C. § 12101(b)(1). To that end, it prohibits any covered employer — and FAS is within that category, see id. § 12111(5) — from discriminating against a qualified individual because of that individual's disability. This prohibition extends to a wide variety of employment-related matters, including recruitment and hiring. Id. § 12112(a).

To evaluate the merits of a failure-to-hire claim brought under the ADA, an inquiring court must ask three questions: (1) Did the disappointed applicant have a disability? (2) Was the applicant an otherwise qualified individual? (3) Did the employer discriminate against the applicant on the basis of that disability? See Laurin v.

<u>Providence Hosp.</u>, 150 F.3d 52, 56 (1st Cir. 1998).  A negative answer to any of these queries dooms the applicant's quest.

In this case, the district court — for simplicity's sake, we use that term institutionally and do not distinguish hereafter between the district judge and the magistrate judge — concluded that the appellant could not survive the first two inquiries because she was neither disabled within the purview of the ADA nor qualified for the EMT position.  We examine this bipartite conclusion.[5]  At FAS's behest, we also examine whether the appellant has made out a genuine issue of material fact as to discrimination.

**A**

The word "disability" is a term of art in the ADA context.  The statute offers three alternative definitions:  a person is considered disabled if she suffers from "a physical or mental impairment that substantially limits one or more of [her]

_____

[5]Although we write in terms of the ADA, our comments apply with equal force to the appellant's claim under its state-law counterpart, Mass. Gen. Laws. ch. 151B, § 4.  That statute tracks the ADA in virtually all respects. <u>Whitney</u> v. <u>Greenberg, Rosenblatt, Kull & Bitsoli, P.C.</u>, 258 F.3d 30, 32 n.1 (1st Cir. 2001).  The lone exception is that the use of mitigating measures must be taken into account when determining the extent of an individual's disability under the ADA, <u>Sutton</u> v. <u>United Air Lines, Inc.</u>, 527 U.S. 471, 482 (1999), whereas the disability must be considered in its natural state under Massachusetts law, <u>Dahill</u> v. <u>Police Dep't of Boston</u>, 748 N.E.2d 956, 963 (Mass. 2001).  Inasmuch as the appellant does not use a prosthetic device, this difference is irrelevant here.

major life activities," 42 U.S.C. § 12102(2)(A); is stigmatized by "a record of such an impairment," id. § 12102(2)(B); or is "regarded as having such an impairment," id. § 12102(2)(C). Although Congress did not explicitly delegate authority to refine the meaning of these statutory terms to any particular administrative agency, see Toyota Motor Mfg. v. Williams, 122 S. Ct. 681, 689 (2002); Sutton v. United Air Lines, Inc., 527 U.S. 471, 479 (1999), the Equal Employment Opportunity Commission (EEOC) seized the initiative and promulgated regulations aimed at clarifying the statutory terminology, see 29 C.F.R. § 1630.2(g)-(l) (1991).

Two pertinent EEOC regulations advance our analysis. First, the EEOC has defined "major life activities" to include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. § 1630.2(i). In an interpretive guidance accompanying the regulations, the EEOC noted that this list is not all-encompassing and emphasized that point by adding sitting, standing, reaching, and lifting to the roster of likely major life activities. Id. pt. 1630, App. § 1630.2(i).

Second, the EEOC has defined the term "substantially limits" in this context as:

-14-

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

Id. § 1630.2(j)(1). The EEOC has gone a step further and recommended that a court, in applying this standard, consider the nature and severity of the impairment, its expected duration, and its permanent or long-term impact. Id. § 1630.2(j)(2). Against this backdrop, we turn to the question of whether the appellant, contrary to the district court's intuition, has succeeded in making out a genuine issue as to what is clearly a material fact: whether she suffers from a disability. To mount this inquiry, we first must determine whether lifting is a major life activity. The "touchstone for determining an activity's inclusion under the statutory rubric is its significance." Bragdon v. Abbott, 524 U.S. 624, 638 (1998) (citing Abbott v. Bragdon, 107 F.3d 934, 940 (1st Cir. 1997)). The term "major life activities," as used in the ADA, "refers to those activities that are of central importance to daily life." Toyota, 122 S. Ct. at 691. Whether lifting pen to paper or glass to mouth, lifting is an integral part of everyday

-15-

life and seems to fit comfortably within the parameters set by the Court. We conclude, therefore, that the EEOC appropriately interpreted the statute, see 29 C.F.R. pt. 1630, App. § 1630.2(i), and that lifting is a major life activity.

The next question is whether the appellant is substantially limited in this major life activity. The ADA "addresses substantial limitations on major life activities, not utter inabilities." Bragdon, 524 U.S. at 641. Thus, when an impairment results in significant limitations, that impairment is substantially limiting even if the limitations are not insurmountable. See id.; see also Sutton, 527 U.S. at 488 (explaining that "individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run"). The focus is not on whether the individual has the courage to participate in the major life activity despite her impairment, but, rather, on whether she faces significant obstacles when she does so. The EEOC's emphasis on "condition, manner, or duration" in contrasting how a disabled person performs an activity and how a member of the general public performs that same activity dovetails with this formulation.

In concluding that the appellant had no substantial limitation on her ability to lift, the district court relied upon two items. The first of these was the appellant's optimistic self-assessment of her capabilities. This consideration deserves little weight. Although the appellant took an upbeat view of her prowess (when FAS's counsel asked, during her deposition, if there was anything that she would like to do that she had not been able to do because of her missing hand, she replied "no"), that was more a testament to her determination than to her condition. She did not dwell on the restrictions on lifting that she had to overcome in order to achieve her objectives — and those restrictions comprise the focal point of this prong of the ADA inquiry. The key question is not whether a handicapped person accomplishes her goals, but whether she encounters significant handicap-related obstacles in doing so. For summary judgment purposes, we must resolve this question in the appellant's favor.

The second consideration credited by the district court was the appellant's demonstrated ability to lift forty to fifty pounds. In attaching significance to this factor, the court relied on case law holding that restrictions on heavy lifting are not indicative of a disability. E.g., Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1207 (8th Cir. 1997) (holding that a

restriction on lifting more than twenty-five pounds is insufficient to constitute a disability within the meaning of the ADA); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996) (theorizing that the "inability to perform heavy lifting does not render a person substantially limited" in the major life activity of lifting).

As a comparison between the impairments alleged in those cases and the appellant's impairment illustrates, that reliance is mislaid. The cases holding that an inability to lift heavy objects does not constitute a substantial limitation on a person's overall ability to lift rely implicitly in some instances, e.g., Snow, 128 F.3d at 1207, and explicitly in others, e.g., Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346, 349 (4th Cir. 1996) (per curiam), on the rationale that a capacity to perform heavy lifting is not a trait shared by the majority of the population. That reasoning is understandable: strength varies widely throughout the population, and if a restriction on heavy lifting were considered a substantial limitation on a major life activity, then the ranks of the disabled would swell to include infants, the elderly, the weak, and the out-of-shape. Congress obviously did not mean to extend the protections of the ADA to every physical impairment that precluded the performance of some

particularly difficult manual task.  See Toyota, 122 S. Ct. at 691.

Although these cases seem to be correctly decided, they are inapposite here.  A missing hand is a more profound impairment than a simple inability to lift objects over a certain weight.  Such an impairment poses a type of restriction on lifting not shared by a significant portion of the populace. While most people can use two hands to pick up a plate or carry groceries (or even do both at the same time), a one-handed individual must develop an array of techniques to overcome her innate limitation.  Even if she is able to lift more poundage than many two-handed individuals, the manner in which she lifts and the conditions under which she can lift will be significantly restricted because she only has one available limb.  In this sense, at least, the appellant's lack of a hand will substantially limit her ability to lift notwithstanding her extraordinary efforts to compensate for her impairment.

FAS counters with the argument that the appellant failed to provide sufficient proof that her impairment substantially limited her ability to lift (i.e., she did not offer evidence elucidating the exact nature of her inability to lift) and, therefore, failed to create a genuine issue as to whether she is substantially limited in this major life

-19-

activity.  In mounting this argument, it relies upon the Supreme Court's decision in <u>Albertson's, Inc.</u> v. <u>Kirkingburg</u>, 527 U.S. 555 (1999), a case in which the Court held that a monocular individual must prove his disability "by offering evidence that the extent of the limitation in terms of [his] own experience . . . is substantial."  <u>Id.</u> at 567.

This argument misconstrues the holding in <u>Albertson's</u>. Central to Justice Souter's analysis was the nature of a monocular impairment.  Even though a monocular individual has only one eye with which to see, the Court explained that the individual's body often will adjust its vision to account for this impairment.  <u>Id.</u> at 566-67.  Just as artificial mitigating measures must be factored into the disability calculus, <u>Sutton</u>, 527 U.S. at 482, so too adjustments undertaken within the body's own systems must be taken into account.  <u>Albertson's</u>, 527 U.S. at 565-66.  For present purposes, the key is that the <u>Albertson's</u> Court did not, as a matter of law, dismiss monocularity as a disability.  Rather, the Court held that a monocular individual, like any other ADA plaintiff, must proffer evidence demonstrating the extent of the limitation on the designated major life activity (there, the ability to see).  <u>Id.</u> at 567.  The Court emphasized that this burden is modest and

indicated that, as a general rule, monocular individuals will satisfy the ADA's criteria for disability.  Id.

The Supreme Court's recent decision in Toyota is along the same lines.  There, the Court held that a plaintiff afflicted with carpal tunnel syndrome cannot rely upon that diagnosis alone to prove a disability under the ADA.  Toyota, 122 S. Ct. at 692.  The Court reminded us that:

> An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person. . . .  Given the[] large potential differences in the severity and duration of the effects of carpal tunnel syndrome, an individual's carpal tunnel syndrome diagnosis, on its own, does not indicate whether the individual has a disability within the meaning of the ADA.

Id. (citations omitted).  Since the plaintiff's particular form of carpal tunnel syndrome permitted her to engage in a wide range of manual tasks, the Court was unwilling to find that her impairment could be considered disabling as a matter of law. Id. at 694.

When all is said and done, however, these decisions do not alter the usual standard that obtains on summary judgment in ADA cases:  "[A] plaintiff must proffer evidence from which a reasonable inference can be drawn that [a major life] activity is substantially or materially limited."  Snow, 128 F.3d at

-21-

1207. The evidence needed to establish the limiting qualities of a particular impairment almost always will be unique to that impairment and to the individual involved. See Sutton, 527 U.S. at 483. Still, that evidence need not necessarily be composed of excruciating details as to how the plaintiff's capabilities have been affected by the impairment. See Albertson's, 527 U.S. at 566 (observing that "some impairments may invariably cause a substantial limitation of a major life activity"). We would not demand, for example, that a paraplegic expound on the many scenarios in which she is unable to walk. Indeed, adopting such a rule would place deserving ADA plaintiffs in an unenviable "catch-22:" in order to demonstrate that she is disabled, the plaintiff also would have to demonstrate why she is unqualified to do the job to which she aspires. See David Olsky, Note, Let Them Eat Cake: Diabetes and the Americans with Disabilities Act After Sutton, 52 Stan. L. Rev. 1829, 1832 (2000).

We need not probe this point too deeply, for the record shows that, at the most general level of diagnosis, the appellant is a genetic amputee. To supplement this diagnosis, she has supplied specific information about the nature of her impairment — her arm is missing a few inches below the elbow — and she has confirmed that she does not use a prosthesis or other correcting device. The record also contains some evidence

about the extent of her limitations in grasping things; the appellant revealed during the preemployment physical that she uses the remnant of her left arm only to pin and hook objects. Taking this information in the light most favorable to the appellant, we think that it suffices to support a finding that she is significantly restricted in the activity of lifting. No more is exigible at the summary judgment stage.[6]

**B**

The ADA's employment discrimination prohibitions apply only to those who are qualified to perform particular jobs. See 42 U.S.C. § 12112(a). In this context, Congress defined a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). The employee or applicant bears the burden of showing that she meets this standard. See EEOC v. Amego, 110 F.3d 135, 144 (1st Cir. 1997); see also Laurin, 150 F.3d at 61 (explaining that an ADA plaintiff must present some evidence to rebut the employer's conclusion that a particular function is essential for a

---

[6]Inasmuch as a genuine issue of material fact exists as to whether the appellant is disabled, we need not discuss whether the record, viewed in her favor, supports a finding that she was "regarded as" disabled by FAS.

particular job).  Moreover, if (and to the extent that) essential job functions implicate the safety of others, the plaintiff must demonstrate that she can perform those functions in a manner that will not endanger others.  Amego, 110 F.3d at 144.

The EEOC has promulgated regulations that elaborate on this subject.  The regulations explain that a qualified individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and . . . with or without reasonable accommodation, can perform the essential functions of such position."  29 C.F.R. § 1630.2(m).  The regulations describe "essential job functions" somewhat tautologically as "fundamental job duties," exclusive of "the marginal functions of the position."  Id. § 1630.2(n)(1).

In deciding whether a specific job function is essential or marginal, courts must pay heed "to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8).  The EEOC's regulations add that "[e]vidence of whether a particular function is essential

-24-

includes, <u>but is not limited to</u>," an employer's determination of what is an essential function of the job. 29 C.F.R. § 1630.2(n)(3) (emphasis supplied). They also recommend considering evidence of the amount of time spent performing the particular function, the consequences of not requiring the applicant to perform the function, and the past and current work experience of incumbents in the job (or in similar positions elsewhere). <u>Id.</u> The purpose of these provisions is not to enable courts to second-guess legitimate business judgments, but, rather, to ensure that an employer's asserted requirements are solidly anchored in the realities of the workplace, not constructed out of whole cloth. <u>See</u> <u>id.</u> pt. 1630, App. § 1630.2(n).

Following the statutory and regulatory mosaic, we have made clear that the employer's good-faith view of what a job entails, though important, is not dispositive. <u>See</u> <u>Ward</u> v. <u>Mass. Health Research Inst.</u>, 209 F.3d 29, 34 (1st Cir. 2000) (noting that an employer's view of job requirements generally should be given "substantial weight," but that it is "only one factor" in the mix); <u>see</u> <u>also</u> <u>Amego</u>, 110 F.3d at 147 (explaining that "the employer's judgment is entitled to some weight"). In the final analysis, the complex question of what constitutes an

essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis.

This body of law serves as the backdrop for a discussion of the second issue in this case. In moving for summary judgment, FAS argued that the appellant could not perform a duty that it purportedly required of all EMTs: lifting seventy pounds. The district court agreed. Consequently, the court held, as an alternate ground for summary judgment, that the appellant was not qualified to perform the job of an EMT when she applied to FAS. Appellate review of this holding involves a bifurcated inquiry. First, we ask whether the plaintiff could have performed the essential functions of the particular job; and, if not, whether some reasonable accommodation would have enabled her to perform those functions. Ward, 209 F.3d at 33.

To prove its point, FAS's memorandum in support of summary judgment cited a portion of the appellant's deposition testimony. There, she described the weightlifting regimen that she undertook after she failed AMR's strength test, stating that she had begun with forty- and fifty-pound weights — which she could easily lift — and worked her way up to ninety pounds. Those statements led to the following exchange (which FAS deems

conclusive proof of the appellant's inability to perform an essential job function):

> Q.  At what point in terms of the amount of time you spent working on improving your strength did you get to the point where you could lift 60 pounds?
>
> A.  I don't know.
>
> Q.  Was it more than two weeks?
>
> A.  I honestly don't know, I don't remember.
>
> Q.  Could it have been as much as a month?
>
> A.  To get past 60 pounds?
>
> Q.  Yes.
>
> A.  I doubt it.  I think it got — it was about a month for me to be able to lift the required amount to pass the exam.
>
> Q.  And you don't — you can't currently recall what point in that exercise strength-building process you reached the ability to lift any particular level weight.
>
> A.  No.

The appellant objected to the summary judgment motion. Along with her opposition, she filed an affidavit in which she swore that, when she sought employment with FAS, she was able to do all the lifting that the EMT position legitimately required. To bolster this statement, she pointed to her performance in practical exercises conducted during the EMT certification classes (where, with a partner, she consistently lifted

-27-

classmates of an average weight of 160 pounds on a weighted stretcher).  She explained the seeming inconsistency between this statement and her deposition testimony on the basis that the latter related to incremental weight training, not to practical, in-the-field experience.  She concluded that she could have passed the FAS strength test had it been administered to her as originally scheduled by Dr. Qazi.

The district court accepted FAS's appraisal, noting that "[i]t appears from the [appellant's] deposition, that at the time that she applied for the EMT position with [FAS], she was unable to lift 60 pounds."[7]  The court gave short shrift to the affidavit because a party "may not create a triable issue simply by filing an affidavit that contradicts an admission in an earlier deposition."

For purposes of summary judgment, we find the district court's interpretation of the facts too constricted.  Although it is true that a party opposing summary judgment cannot create a genuine issue of material fact by the simple expedient of filing an affidavit that contradicts clear answers to unambiguous questions in an earlier deposition, Colantuoni v.

---

[7]The perceived inability to lift sixty pounds, if documented in the record, would mean, of course, that the appellant lacked the ability to lift the seventy-pound minimum allegedly required by FAS.

-28-

Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994), the deposition testimony here was neither clear nor unambiguous. The appellant testified that she did not know whether she could lift a particular weight on a particular date, but that it did not take her long to reach ninety pounds. Thus, the deposition testimony is, at best, inconclusive as to whether she could have lifted any given weight lower than ninety pounds at some earlier time (say, when she applied for an EMT position with FAS). A subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration in opposition to a motion for summary judgment. Shepherd v. Slater Steels Corp., 168 F.3d 998, 1007 (7th Cir. 1999); see also Herring v. Can. Life Assur. Co., 207 F.3d 1026, 1030-31 (8th Cir. 2000). Thus, the district court erred in disregarding the appellant's affidavit.

We note, too, that other competent evidence in the record suggests that, when she sought employment at FAS, the appellant was qualified to do the necessary lifting. Several months before she applied (i.e., during her certification classes), she demonstrated her ability, with a partner, to lift and carry adults on weighted stretchers. Several months after she applied (i.e., during her tenure at AMR and, later, at BMES), she demonstrated her ability to perform the full range of

an EMT's duties, lifting included.  This temporal bracketing constitutes fairly strong circumstantial evidence which, when combined with the other evidence of record, suffices to raise a reasonable inference that the appellant was qualified to fill FAS's vacant EMT position.[8]

In all events, the district court should not have attached decretory significance to the specific weight that the appellant might (or might not) have been able to lift at the time that she applied.  As said, a court should give consideration to what an employer deems essential, but also should take care to ensure that such functions are essential in fact.  Here, the record reveals a genuine issue as to whether FAS, at the time it rejected the appellant's employment application, required all its EMTs to be able to lift seventy pounds.  We explain briefly.

The record reflects that when the appellant submitted to the preemployment examination, FAS did not routinely screen prospective employees to confirm their ability to lift.  Indeed, Fallon admitted in his deposition that the lifting requirement was only in its nascent stage, and that the appellant probably

---

[8]This inference is not undercut by the appellant's failure initially to pass the AMR lifting test.  After all, AMR insisted that its EMTs lift a greater weight — ninety pounds — than FAS purportedly required, and the appellant met this higher standard after a brief regimen of weight training.

would have been the first to be required to pass such a test. This dovetails with Dr. Qazi's deposition testimony to the effect that he had tested the ability to lift only on rare occasions in connection with his work for FAS, and that he was not aware of any firm lifting requirement at the time that he examined the appellant. The evidence, then, does not support the conclusion that, as a matter of law, lifting seventy pounds constituted an essential function of the EMT position.

FAS presents a variation on this theme, asserting that it required its EMTs to perform two-handed lifting, and that having two hands is a sine qua non of the EMT position. To buttress this assertion, FAS cites the list of essential job functions that it was preparing in conjunction with Milton Hospital. The list, not yet in final form when the appellant applied, stated that the EMT position involved "[l]ifting with two hands individually up to 70 pounds for a total height of 6 inches from knuckle height occasionally." FAS told the MCAD that the appellant's inability to perform two-handed lifting was "the sole reason" that it refused to hire her.

Although the question is not free from doubt — after all, it is certainly reasonable for an employer to be concerned about whether a one-handed EMT could fulfill her responsibilities in a field involving the health and safety of

-31-

others — FAS's "essential function" argument does not entitle it to summary judgment on the record as it stands. If two hands were essential, then it logically would follow that an individual with only one hand — like the appellant — could never satisfy that requirement (and, therefore, could not qualify for the position). But FAS's actions belie such a conclusion. After all, FAS made a conditional offer of employment to the appellant, whom it knew to have only one hand, and requested that she submit to a preemployment examination. In and of itself, that request attests to FAS's belief, at the relevant time, that a one-handed individual might be able to perform the essential functions of the EMT position. If two-handed lifting could only be done by a two-handed person, then the preemployment examination would have been at best an empty exercise, and at worst a cynical charade.

Other evidence also undermines the argument that two-handed lifting is an essential job function. For one thing, the MDPH certified the appellant to work as an EMT despite the fact that she had only one hand. For another thing, the "essential job function" list was merely a work in progress at the critical time. Third, Fallon testified that the list had been drafted on the basis of observations made by a member of the Milton Hospital team concerning how EMTs picked up stretchers while

working at FAS.  Thus, the list reported on a historical fact — how EMT work traditionally has been performed — which, while relevant, did not conclusively prove that two hands were <u>required</u> to perform this task.  Further, the appellant's deposition testimony and affidavit regarding her own experiences tend to prove that two hands are not essential for this purpose.  To cinch matters, when Fallon was asked whether two-handed lifting necessarily meant lifting with two hands, he replied: "No, it does not."

We add a caveat.  Our rejection of FAS's position does not mean that the "essential function" inquiry is never amenable to summary judgment.  When an employer proves that it has gone through a deliberative process or has mustered evidence of judgments of public health officials, that evidence may undercut any argument that the employer based its decision on the plaintiff's proficiency in a marginal function of the job.  <u>Cf.</u> <u>Amego</u>, 110 F.3d at 146-47 & n.11.  But the line between an essential function that seems at first blush to be self-evident and a marginal function is sometimes blurred.  That is the case here.  Taking the full panoply of proof into account and indulging all reasonable inferences in the appellant's favor, a rational factfinder could conclude that the appellant was qualified for the EMT position at the time that she sought

employment with FAS.[9]  See, e.g., Holiday v. City of Chattanooga, 206 F.3d 637, 644-45 (6th Cir. 2000) (reversing an entry of summary judgment in analogous circumstances).

## C

FAS urges us to hold that the appellant has not adduced sufficient evidence to support an inference that it discriminated against her on the basis of her disability. Inasmuch as we may affirm the entry of summary judgment on any independent ground made manifest by the record, Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999), we consider this exhortation.

FAS's argument brings into focus a fine line that separates permissible and impermissible decisionmaking under the ADA.  The ADA prohibits employment decisions based on stereotypes about a disability, but it does not prohibit decisionmaking based on the actual attributes of a disability. Pesterfield v. Tenn. Valley Auth., 941 F.2d 437, 443 (6th Cir. 1991); Anderson v. Univ. of Wis., 841 F.2d 737, 740 (7th Cir. 1988).[10]  Thus, an employer may base a decision on an employee's

_____

[9]Whether FAS might reasonably have believed that the appellant, if hired, would have posed a threat to patients or coworkers is a different question.  We return to that question in due course.  See infra Part II(C).

[10]Although both of these cases were decided under the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), their holdings

-34-

actual limitations, even if those limitations result from a disability. <u>Matthews</u> v. <u>Commonwealth Edison Co.</u>, 128 F.3d 1194, 1196 (7th Cir. 1997). By the same token, an employer may refuse to hire a prospective employee because she is unable to do the job, even though a handicap lies at the root of that inability.

Of course, an employer cannot insulate itself from liability under the ADA merely by asserting its belief that a prospective employee's known disability will limit her ability to perform a particular job to such an extent as to disqualify her from employment. Even if the employer's belief is honestly held, on particular facts a jury still might conclude that it rested on an unfounded stereotype (and, therefore, constituted discrimination). <u>See</u> <u>Zapata-Matos</u> v. <u>Reckitt & Colman, Inc.</u>, 277 F.3d 40, 45-46 (1st Cir. 2002). To avoid liability in this sort of situation, the evidence must show that the employer understood the nature, extent, and implications of the prospective employee's particular impairment, and that the employment decision reflected that understanding. <u>See</u> <u>Holiday</u>, 206 F.3d at 643. Only by insisting on that level of proof can courts effectuate one of the primary goals of the ADA: "to prohibit employers from making adverse employment decisions

_____

are fully transferable to cases arising under the ADA. <u>See</u> <u>Phelps</u> v. <u>Optima Health, Inc.</u>, 251 F.3d 21, 23 n.2 (1st Cir. 2001).

-35-

based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics." EEOC v. Prevo's Family Market, Inc., 135 F.3d 1089, 1097 (6th Cir. 1998).

The trick, then, is to distinguish between unfounded stereotypes, on the one hand, and frank assessments of the actual consequences of a disability, on the other hand. That inquiry is fact-dependent. For example, in a situation in which an employer fails to hire an applicant and attributes that failure to the limitations imposed by the applicant's known disability, the employer must show that it made due inquiry into the applicant's impairment, sufficient to inform itself of those limitations, and that the results of that individualized inquiry furnished a reasonable foundation for the employer's belief that the applicant was unqualified. See Holiday, 206 F.3d at 643. If the employer's assumptions about an applicant's disability are unreasonable, or are not based upon a good-faith assessment of that individual's capabilities and ultimately prove to be groundless, its refusal to hire will engender liability under the ADA. See Smith v. Chrysler Corp., 155 F.3d 799, 807-08 (6th Cir. 1998).

Here, FAS claims that the evidence shows conclusively that it reached its decision not to hire the appellant on the

basis of her real capabilities (or lack thereof), not on an illegal stereotype. The critical question, then, is whether the adverse employment action — the refusal to hire — resulted from an informed and considered decision, based on appropriate criteria. Because this case was decided on summary judgment, that question mutates into a question of whether the record reveals a genuine issue of material fact as to why FAS rejected the appellant's application for the EMT position.

To answer that question, we reassemble the familiar framework first erected in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999) (approving use of McDonnell Douglas framework in connection with ADA claims of disability discrimination). Under that framework, the plaintiff first must establish a prima facie case by "prov[ing] by a [preponderance] of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). This showing is easily made and, once achieved, triggers a presumption of discrimination. At that point, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment

action.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-07 (1993).  This is a burden of production, not a burden of persuasion, and satisfying it "serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext."  Burdine, 450 U.S. at 255-56.

Once the employer has produced such an explanation and the plaintiff has questioned it (as, say, pretextual or irrelevant), the initial presumption evaporates.  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991).  The trier of fact then focuses on the main event:  deciding whether the evidence adduced is sufficient to sustain a finding of discriminatory intent on the part of the defendant.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).  The ultimate question is not the veracity of the defendant's explanation — proof of falsity, in and of itself, does not compel a finding of discriminatory intent, see St. Mary's Honor's Ctr., 509 U.S. at 511 — but, rather, whether the plaintiff's evidence suffices to demonstrate the defendant's

animus.[11]  Zapata-Matos, 277 F.3d at 45; accord Abramian v. President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1085 (Mass. 2000) (establishing same principle under counterpart Massachusetts statute).

In the case at hand, the appellant presented evidence that she is disabled; that she applied and was qualified for the EMT position; that she was rejected despite her qualifications; and that FAS thereafter continued to hire EMTs.  This was enough to satisfy the prima facie case requirement.  See Gadson v. Concord Hosp., 966 F.2d 32, 34 (1st Cir. 1992) (per curiam). FAS responded by providing an explanation for its refusal to hire — the appellant's limited capabilities — that was sufficient on its face to dispel the presumption created by the prima facie case.  See Burdine, 450 U.S. at 254-55.

With the presumption of discrimination gone, we scrutinize the facts, indulging all reasonable inferences in the appellant's favor, and ask whether the evidence conclusively demonstrates that FAS acted on the basis of an objectively reasonable assessment of the appellant's capabilities and not on

---

[11]We do not mean to suggest, however, that a factfinder may not infer discriminatory intent from the defendant's proffer of a pretextual explanation.  The opposite is true.  Reeves, 530 U.S. at 147.

the basis of an unfounded stereotype about the nature of her impairment. We do not think that it does.

In the first place, FAS continually asserted its position that a one-handed woman could not be an EMT without hurting herself or others, yet never fully tested the appellant's lifting capabilities. FAS persisted in this course of conduct even after the appellant alerted Hamilton to the fact that the strength test recommended by Dr. Qazi had not been performed and complained that Dr. Winters had never examined her. Given this state of affairs, a reasonable factfinder could conclude that such an examination was vital to an understanding of how (and to what extent) the appellant might be able to balance stretchers, carry patients down stairs, and otherwise perform the requisite duties of an EMT. By the same token, a factfinder could conclude that, absent such testing, FAS based its decision on a stereotype about one-handed persons.

In the second place, the record shows that the appellant ultimately succeeded in performing all the duties of an EMT with two other employers (and, thus, overcame obstacles that FAS had thought insurmountable). This evidence, coupled with the appellant's successful completion of the "practical" portion of the EMT certification examination, could support an inference that she was able to perform those duties at the time

FAS rejected her application. See, e.g., Holiday, 206 F.3d at 644-45; Gilday v. Mecosta County, 124 F.3d 760, 766 (6th Cir. 1997). Thus, a reasonable factfinder could conclude that FAS's negative assumptions not only were based on an unfounded stereotype about the appellant's impairment but also were inaccurate.

In an effort to blunt the force of these facts, FAS argues that it was entitled to rely on the advice it received from Dr. Winters. It notes that the ADA specifically permits a prospective employer to commission a preemployment physical examination once a conditional offer of employment has been made, see 42 U.S.C. § 12112(d)(3), and asseverates that its good-faith reliance on the results of such an examination should put to rest any legitimate question about its intentions.

The case law does not support so mechanistic a view. To be sure, obtaining a physician's detailed assessment and then acting in accordance with it can be persuasive evidence that an employer has based its decision on an individualized inquiry into the applicant's capabilities. See, e.g., Pesterfield, 941 F.2d at 443-44; Bento v. I.T.O. Corp., 599 F. Supp. 731, 744-45 (D.R.I. 1984). But a physician's endorsement does not provide complete insulation. An employer cannot evade its obligations under the ADA by contracting out personnel functions to third

-41-

parties — and this prohibition extends to an employer's attempt to use a preemployment examination as conclusive proof of an applicant's physical capabilities. Holiday, 206 F.3d at 645; cf. 42 U.S.C. § 12112(d)(1) (prohibiting disability discrimination in preemployment physical examinations); 29 C.F.R. § 1630.14(d)(2) (same).

The short of it is that a medical opinion is often cogent evidence of nondiscriminatory intent — in some instances, it may even be enough to justify summary judgment, see, e.g., Crocker v. Runyon, 207 F.3d 314, 319 (6th Cir. 2000) — but the mere obtaining of such an opinion does not automatically absolve the employer from liability under the ADA. Cf. Bragdon, 524 U.S. at 650 (emphasizing that "courts should assess the objective reasonableness of the views of health care professionals without deferring to their individual judgments"). Thus, an employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions. See Holiday, 206 F.3d at 645 (explaining that "[c]ourts need not defer to an individual doctor's opinion that is neither based on the individualized inquiry mandated by the ADA nor supported by objective scientific and medical evidence").

Holiday has especial pertinence to the present appeal. In that case, an HIV-positive individual applied for a position as a police officer, and subsequently passed both the written and physical tests necessary to join the force. Id. at 640. Then, in the course of a preemployment examination, conducted by a physician specializing in occupational health matters, he revealed his HIV status. The physician eschewed any individualized testing of the effect of that impairment but told the employer that Holiday, due to his HIV-positive status, would be unable to withstand the rigors of police work. Id. at 641. After the employer rejected Holiday's bid for employment, he was hired as a police officer by a different agency. Id. at 644.

The district court granted summary judgment for the employer, but the court of appeals reversed. It held that the employer did not have an unconditional right to rely on the physician's "unsubstantiated and cursory medical opinion" to settle the question of Holiday's actual qualifications. Id. at 645. The court regarded the absence of any scientific support for the doctor's opinion as implicating the reasonableness of the employer's reliance on it. Id. at 647. The court concluded that "Holiday was entitled to be evaluated based on his actual abilities and the relevant medical evidence, and to be protected

from discrimination founded on fear, ignorance or misconceptions."  Id. at 648.

The parallels between Holiday and the case at bar are easily drawn.  In both instances, the applicant had taken courses and passed tests adumbrating a general fitness for the position sought.  In both, the employer reached its assessment of the applicant's capabilities on the basis of a preemployment examination.  In both, the physician neglected fully to examine the applicant or to conduct an individualized examination of the effects of a known disability — and the employer knew as much.  In both, the physician offered his opinion without citing objective evidence to show how the disability would affect the particular applicant's fitness to perform work.  And in both, the applicant obtained a similar position a short time later and served creditably in it, thus casting doubt on the reasonableness of the physician's assessment.

We find the reasoning of the Holiday court persuasive, especially given the striking similarities between that case and this.  We conclude that the appellant adduced sufficient evidence from which a reasonable factfinder could conclude that FAS refused to hire her as an EMT without any objective medical evidence that she was physically incapable of performing the essential functions of the position, acting instead on the basis

of its (and its lead physician's) stereotyping of one-handed persons. We rest this conclusion, in part, on the view that a reasonable factfinder could determine that Dr. Winters's opinion was unsupported. After all, Dr. Winters made no inquiry into the appellant's actual ability to lift (and, indeed, prevented Dr. Qazi from performing such an evaluation). Moreover, in light of the fact that the appellant soon found employment as an EMT elsewhere and performed all the duties of the position without incident, a reasonable factfinder could infer that Dr. Winters's opinion was based on an unfounded assumption. We therefore hold that the Winters opinion does not provide sufficient certainty to warrant summary judgment in favor of FAS.[12]

For these reasons, we deem the record inconclusive on this prong of the ADA inquiry. A trial must be held to decide whether FAS acted on an illegal stereotype as opposed to an adequate assessment of the appellant's capabilities. As part and parcel of this decision, the factfinder will need to assess,

_____

[12]This conclusion is bolstered to some degree by other evidence in the record from which a reasonable factfinder might find that FAS's proffered rationale was pretextual. Fallon asked questions during the employment interview about the nature of the appellant's disability that may well have offended the statutory prohibition. See 42 U.S.C. § 12112(d)(2). FAS's use of an employment application that asked for an enumeration of physical defects and a workers' compensation history, see supra note 1, is equally troubling.

inter alia, the factual foundation of Dr. Winters's opinion, and whether or not FAS acted in an objectively reasonable way in relying on that opinion. While an employer need not be unfailingly correct in its assumptions, its subjective beliefs about an applicant's limitations must have a sufficient factual foundation to make them objectively reasonable. See Cook v. State of R.I., Dep't of Mental Health, Retardation, & Hosps., 10 F.3d 17, 26-27 (1st Cir. 1993).

## III. CONCLUSION

We need go no further. Because genuine issues of material fact persist on at least three salient questions — whether the appellant's impairment was disabling, whether she was qualified for the position at the time that she applied, and whether FAS discriminated against her on the basis of an illegal stereotype — the district court erred when it granted FAS's motion for summary judgment. We therefore vacate the judgment and remand for further proceedings consistent with this opinion. In so doing, we intimate no view as to how these questions should be answered or as to the ultimate outcome of the underlying litigation.

**Vacated and remanded. Costs shall be taxed in favor of the appellant.**