**Gary S. WEBBER, Plaintiff**

v.

**INTERNATIONAL PAPER CO., Defendant**

No. Civ. 02–63–B–S.

United States District Court, D. Maine.

Feb. 3, 2003.

---

Arthur J. Greif, Julie D. Farr, Gilbert & Greif, P.A., Bangor, ME, for Plaintiff.

Kate S. DeBevoise, Bernstein, Shur, Sawyer & Nelson, Portland, ME, Vincent J. Miraglia, McGuire Woods LLP, Washington, DC, for Defendant.

## ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

SINGAL, District Judge.

The United States Magistrate Judge filed with the Court on December 20, 2002 her Recommended Decision. Defendant filed its objections to the Recommended Decision on January 10, 2003 and Plaintiff filed his response to those objections on January 21, 2003. I have reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, and determine that no further proceeding is necessary.

1. It is therefore *ORDERED* that the Recommended Decision of the Magistrate Judge is hereby *AFFIRMED.*

2. It is further *ORDERED* that Defendant's Motion for summary judgment is *DENIED* with respect to Count I and *GRANTED* with respect to Count II.

## RECOMMENDED DECISION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KRAVCHUK, United States Magistrate Judge.

Plaintiff Gary S. Webber contends that Defendant International Paper Company discriminatorily eliminated his project engineer position in International Paper's Bucksport mill as part of a nation-wide reduction in force carried out in 2001. Webber filed a complaint in Hancock County Superior Court for disability and age discrimination in employment under the Maine Human Rights Act, 5 M.R.S.A. §§ 4752 & 4621. International Paper timely removed Webber's action to this Court based on the existence of diversity jurisdiction. Now pending is International Paper's Motion for Summary Judgment against both claims. I **RECOMMEND** that the Court **DENY** the Motion with respect to Webber's claim of disability discrimination and **GRANT** the Motion with respect to his claim of age discrimination.

### Summary Judgment Material Facts

Summary judgment is warranted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). The following facts are drawn from the parties' Local Rule 56 statements of material facts, found in the court's record at docket numbers 12, 15 and 19.[1]

St. Regis Paper hired Plaintiff Gary Webber to work as a mechanical draftsman in its Bucksport mill in 1983. Sometime shortly thereafter, Champion International acquired the Bucksport mill from St. Regis. Although he has never possessed an engineering degree, Champion promoted Webber to the position of associate engineer in March 1987. In January 1991, Champion again promoted Webber, this time to the position of engineer. Between April 1991 and July 1994, Webber worked in the engineering department as a "project engineer." In July 1994, Champion reassigned him to a position as a finishing/shipping supervisor. Webber eventually returned to the engineering department and to a project engineer position in October 1998, where he remained until discharged by International Paper, which merged with Champion in June 2000. As a project engineer, Webber was in charge of various building and construction projects within the mill, including roofing projects, redesigning the accounting department, purchasing heavy machinery and parking lot maintenance. *Docket No. 12*, ¶¶ 1, 2, 3, 4; *Docket No. 15*, ¶¶ 1, 2, 3, 4.

In 1997, while working as a finishing/shipper supervisor, Webber fell from a paper roll and injured his knee. In December 1997, sometime after receiving knee surgery, Webber contacted his foreman, Steve Finley, to seek an additional week off due to surgery-related pain. Mr. Finley chided that "if [Webber] lost 20 pounds or more during that week [his] knee would feel a lot better." Finley and Larry Schaub, who was Webber's supervisor at that time and was present in Mr. Finley's office listening by speaker phone, both "burst out laughing." *Docket No. 12*, ¶¶ 18, 23; *Docket No. 15*, ¶¶ 18, 23.

When he returned to work, Webber received certain accommodations from his employer, including leave time and certain modifications in his working conditions. For example, sometime after Webber returned to the position of project engineer,[2] Webber was permitted to work from home with a laptop computer for a period of time and some of his duties were "rearranged"

---

1. For counsels' benefit the following docket numbers correspond to the following summary judgment filings:
 Docket No. 12–Defendants' [sic] Statement of Material Facts in Support of Motion for Summary Judgment;
 Docket No. 15–Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Statement of Additional Material Facts; and
 Docket No. 19–Defendant's Reply to Plaintiff's Response to Defendant's Statement of Material Facts and to Plaintiff's Statement of Additional Material Facts.

2. Reading between the lines, this appears to have been after International Paper merged with Champion in June 2000 and after Webber's knee replacement surgery in February 2001, but the parties do not offer a very clear chronology. *Docket No. 12*, ¶ 21; *Docket No. 15*, ¶ 21. Exhibit A to the Affidavit of Gary S. Webber, found at docket number 16, reveals that Webber was out on short term disability from February 11, 2001 until May 15, 2001, when he held a position as a project engineer. This exhibit also reveals that Webber was out on short term disability from February 24, 1998 until June 15, 1998, when he was working as a finishing/shipping supervisor, which leave must have followed immediately or shortly after the injury to his knee.

to minimize the need to walk and climb stairs while at the mill. Webber was also permitted to have an office in the first floor accounting department rather than the third floor engineering department. Also, in July 2000, International Paper installed a "stairway lift chair" to assist Webber in getting to the engineering department. Webber's first- and second-line supervisors, Larry Schaub and Steve Moser, referred to the lift as a "Costanza chair," alluding to an episode of the television sitcom, Seinfeld, in which the character George Costanza fakes a disability. *Docket No. 12*, ¶¶ 18, 20, 23; *Docket No. 15*, ¶¶ 18, 20, 23.

On February 6, 2001, Webber underwent a total knee replacement surgery. Following the surgery, Webber's doctor instructed him to undergo a physical therapy regimen and to remain out of work for approximately three months. Webber returned to work at the end of April or beginning of May 2001 with doctor's orders that he restrict himself to walking or standing no more than 50% of the time, to lifting no more than 25 pounds and to avoid squatting or kneeling. Following a re-evaluation by his doctor on May 24, 2001, Webber was instructed by his doctor to reduce the number of hours he worked to four hours per day, four days per week. Webber requested and received permission to work this reduced schedule. *Docket No. 12*, ¶ 21; *Docket No. 15*, ¶¶ 21, 46, 47, 48; *Docket No. 19*, ¶¶ 46, 47, 48.

In roughly June 2001, International Paper undertook an initiative dubbed "Functional FAST," which was designed to, among other things, reduce costs and operational redundancies through a reduction in force. International Paper sought to reduce 3000 positions within various locations and departments, including technology and engineering. In June 2001, International Paper's manufacturing director advised the manager of the Bucksport mill, Fred Oettinger, that he was required to eliminate eight of 47 "technical staff" positions at the mill as part of Functional FAST. To effect this directive, and to determine how best to eliminate the eight positions, Oettinger consulted with certain individuals in International Paper's Memphis and Minnesota offices and with Jeff Hamilton, operations manager of the Bucksport mill, and David Libby, the mill's human resources manager. Working primarily with Hamilton and Libby, Oettinger ultimately eliminated three vacant positions and six occupied positions, including Webber's.[3] Collectively, these three managers considered which staff functions could be reduced with the least effect of the mill's operations, as well as whatever personal knowledge they had of employees' individual capabilities and performances. Oettinger testified at his deposition that he lacked any significant first-hand knowledge of Webber's capabilities and past performance. Libby testified at his deposition that he did not know who Webber was. *Docket No. 12*, ¶¶ 5, 6, 7; *Docket No. 15*, ¶¶ 5, 6, 7.

With respect to the six, non-vacant positions that were eliminated, one occupant accepted an offer of early retirement, though his position will not expire until February 2003. Two other occupants were let go because of performance problems. The particulars concerning the release of one "nonexempt" employee are not specified in the record.[4] According to

---

3. All of the eliminated positions were salaried positions. Plaintiff qualifies certain of Defendant's statements by pointing out that only one of these position was "non-exempt" for

purposes of overtime. I do not see how this distinction is material to the pending motion.

4. *Docket No. 15*, ¶ 7 (identifying the "nonexempt" employee named Wood).

International Paper, "That left two positions in the Technical Department to be identified." [5] Oettinger concluded that two project engineer positions should be eliminated because the mill had eight such positions, more than other, comparable International Paper mills. In deciding which two of its eight project engineers would loose their positions, Oettinger and the other managers considered which two engineers were the least valuable of the eight. According to International Paper, none of the eight had poor performance records, although Oettinger and Libby did not review any of the project engineer's performance evaluations when considering who should lose his position. *Docket No. 12,* ¶¶ 7, 8, 9, 10; *Docket No. 15,* ¶¶ 7, 8, 9, 10.

According to International Paper, "Plaintiff . . . was the first project engineer selected." The second project engineer selected for termination was an individual concerning whom Oettinger had personally received numerous internal complaints. Of the project engineers who remained, two were older than Webber. *Docket No. 12,* ¶¶ 12, 13, 14; *Docket No. 15,* ¶¶ 12, 13, 14.

After selecting the two project engineers whose positions would eventually be eliminated, Oettinger consulted with these individuals' first- and second-line supervisors to solicit their input. With respect to Webber, Oettinger met with Larry Schaub, the first-line manager, and with Steve Moser, the second-line manager. According to International Paper, both men agreed with Oettinger's decision to eliminate Webber's position. *Docket No. 12,* ¶ 15; *Docket No. 15,* ¶ 15.

International Paper asserts that it terminated Webber's position because he was the only project engineer without an engineering degree. Although no specific facts are offered in relation to Webber's skill set in relation to any particular "bigger or more complex project," International Paper maintains that Webber "was not qualified to do some projects that the degreed engineers were qualified to perform." However, it does appear that the other project engineers were responsible for major areas, such as specific paper machines, whereas Webber "handled a lot of the extra stuff." On the other hand, when International Paper gave Webber the project engineer position, it did not require that he possess or obtain an engineering degree. *Docket No. 12,* ¶¶ 11; *Docket No. 15,* ¶¶ 11.

On June 25, 2001, Oettinger and Libby met with Webber to inform him that his position was terminated effective July 15, 2001. Oettinger told Webber that he had been selected because of the lesser quality and quantity of his work. Webber was also informed that he would never work for International Paper again. Some five minutes before this meeting, another of Webber's various supervisors, Tom Thompson, stated to Webber, "You are the weakest link. You are gone." Although he was informed that his termination would not be effective until July 15, 2001, after being notified of his termination on June 25, 2001, International Paper personnel immediately escorted Mr. Webber from the premises. Thus, June 25, 2001

---

5. International Paper's use of the language, "That left . . ." suggests that the statement found in Docket No. 12, ¶ 9 logically follows from the preceding statement. Although it is evident from the parties' statements that the technical department is one component of a larger engineering workforce, there is no ex-

planation offered by either party concerning how the technical department is distinct from other engineering departments or why the technical department was chosen to loose two project engineer positions rather than eliminating one or two project engineer positions from another engineering department.

was the last day that Webber ever "physically worked" at International Paper. Until this date, Webber had continued to work at his reduced schedule of four hours per day, four days per week, pursuant to his doctor's orders. *Docket No. 12*, ¶¶ 16, 17, 19, 23; *Docket No. 15*, ¶¶ 16, 17, 19, 23, 27, 28, 30; *Docket No. 19*, ¶¶ 16, 27, 28, 30.

On or about July 8, 2001, Webber applied for long-term disability benefits. International Paper approved the application on July 20, 2001. In either September or October of 2001, Libby offered Webber a position as an "SQA coordinator." Webber refused the position, although he acknowledges that he was fully capable of performing the job functions required by the position. Webber refused the position because it would require him to work with Oettinger and Libby, who he felt had unfairly chosen him for the reduction in force. The SQA position that Libby offered Webber that September was a pre-existing position that was vacant at the time of Webber's termination in June 2001 and had remained vacant during the intervening period. International Paper argues that despite the vacancy in June, the SQA position was not "available" because International Paper had no intention of filling it at that time. Prior to the Functional FAST initiative, efforts were generally made at the Bucksport mill to keep engineers as employees whenever engineering positions were eliminated because their

skills typically made them valuable in other departments as well. *Docket No. 12*, ¶¶ 17, 22; *Docket No. 15*, ¶¶ 17, 22, 32, 42; *Docket No. 19*, ¶ 42.

One of the goals of the Functional FAST initiative was to outsource project design operations and use in-house engineers primarily to perform project management operations. Of all projects undertaken by International Paper since Webber's termination, only one project required skills that Webber did not possess. Mr. Oettinger and Mr. Schaub were both aware of Webber's knee problems and had observed the difficulty Webber had when walking. Mr. Oettinger was aware that Webber's knee problem had resulted in absences from work and that Webber was working a reduced schedule. International Paper tracks lost-time figures for work-related injuries and Oettinger is concerned lest the Bucksport mill have a higher figure for lost time than other, comparably-sized mills. *Docket No. 15*, ¶¶ 36, 37, 38, 41; *Docket No. 19*, ¶¶ 36, 37, 38, 41.

In his project engineer position, Webber earned approximately $4800.00 per month and received various benefits, including accidental death and dismemberment insurance and matching 401k contributions. *Docket No. 15*, ¶ 54. By comparison, under long term disability Webber receives $3,365.83 per month, but neither death and dismemberment insurance nor matching 401k contributions.[6] *Docket No. 19*, ¶ 54.

---

**6.** Although the Court need not reach the question of whether Webber was disabled for purposes of the MHRA, Webber offers the following facts on the issue:

43. Since Gary Webber's knee replacement surgery in February 2001, his doctor has imposed permanent restrictions on his activities. As a result, he is unable to perform many activities which he used to do in the past, and [has] been required to modify other activities so that he can perform them. The following are some examples of activities which he has ceased or modified:

a. He is no longer able to do any kayaking or boating/fishing, since he is unable to climb into or out of a boat.

b. He is no longer able to play basketball with his children.

c. He can no longer play golf.

d. Although he is still able to do light gardening, he has had to modify his gardening activities. For instance, he uses a milk crate to sit on so he can reach the ground without excessive bending or squatting.

e. He can no longer do yard work such as cutting up and removing fallen tree

## Discussion

branches. He is unable to do the bending and lifting involved in those tasks, and has difficulty with balance on uneven ground. He is also unable to use a chain saw because of the narcotic medication that he is required to take on a regular basis for pain.

f. He used to enjoy doing carpentry and woodworking, but can no longer do those activities. He is unable to use power tools because of his medication.

g. He is unable to do any work on his house that requires the use of a ladder. He recently had to hire someone to paint the trim on his house exterior, which in the past before his knee injury he would have done himself.

h. He can no longer do animal care such as bathing his dog.

i. He is limited in the amount of time that he can drive a vehicle, which restricts his ability to travel distances. He has had to modify the way in which he drives such that he now uses his left foot on the brake and his right foot on the gas. It is very difficult for him to get in and out of vehicles, and he has had to sell two vehicles which he owned that were particularly difficult to get into and out of. He can no longer drive any vehicle with a standard transmission.

j. He had planned some home renovation projects which he has now put on hold as a result of his knee injury. In particular, he had planned to renovate his basement, but is unable to make the frequent trips up and down the stairs that would be necessary for that project. He also cannot move furniture or carry anything heavy.

k. Because he lives in a 2–story house with my [sic] bedroom on the second floor, he has had to modify the way in which he does laundry. He is not able to carry a laundry basket down the stairs, and now has to throw all laundry to the bottom of the stairs. Once the laundry is finished, he has to leave it stacked downstairs and have others carry it upstairs.

l. He is unable to vacuum or wash/wax the floors in his house because of the bending and twisting involved in those activities. He used to do floor washing and waxing on his hands and knees, which he can no longer do.

m. He is able to do grocery shopping, but has to limit the amount of groceries that he buys because he is unable to carry heavy bags of groceries. He has needed to use the power riding shopping cart on several occasions, and he uses a grocery cart to lean on as a walker and to transport the bags of groceries to his car. His family has to carry the groceries in from the car to the house.

n. When preparing meals, he has to do as much preparatory work as possible from a sitting position. He is unable to cook meals that require him to stand at the stove for a long time.

o. He is taking a class at the University of Maine at Orono, and has had difficulty with that class because the university is a large campus and it is difficult for him to walk very far. He has particular difficulty walking on uneven ground, for which he is required to use a cane. His class involves field trips to various areas of the campus, and he has been required to drive to some and miss others if there is no nearby parking.

p. Prior to his knee injury, he had done a significant amount of volunteer activity. He continues to do some volunteer work, but it is very limited in the types of things he can do and the amount of time which he can volunteer, because of pain and swelling in his leg.

q. He has a handicapped parking permit and uses it every day.

44. In addition to the modifications that Gary Webber has made to his activities, he is limited in the amount if time that he can perform these activities. After two to three houses of light activity, his knee and calf become extremely swollen and painful and he is required to sit or lie down and elevate his leg for about an hour.

45. Gary Webber's knee replacement surgery and the resulting limitations on his activities have also affected his relationship with his family. He is married and has two teenage daughters. His wife and daughters are now required to do a lot of tasks for him or to assist him with certain tasks. He is unable to do many activities with his family that he used to do, such as walking, playing basketball, golfing, hiking and kayaking. The constant pain that he has been in since his knee replacement surgery has also affected his disposition and has caused a great deal of strain on his relationship with his wife and his children.

*Docket No. 15,* ¶¶ 43–45.

entitled to judgment as a matter of law against Webber's claims because Webber was neither terminated nor disabled. International Paper also argues that Webber cannot present sufficient facts to permit the jury to view as a pretext the nondiscriminatory reasons it offers for why it eliminated Webber's position. *Defendant's Memorandum of Law in Support of Its Motion for Summary Judgment,* hereinafter *"Docket No. 11,"* at 1. Under the governing summary judgment standard, Webber must establish that a genuine issue of fact exists on each of these issues in order to overcome International Paper's Motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Pursuant to the Maine Human Rights Act ("MHRA"), it is unlawful employment discrimination for any employer to discharge an employee because of a physical disability or age, among other things, unless the disability-based or age-based reason for the discharge concerns "a bona fide occupational qualification." 5 M.R.S.A. § 4572(1); The MHRA not only prohibits discriminatory discharge, but also discrimination "with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment." *Id.; see also* § 4572(2) (relating to discrimination against a qualified individual with a disability). The Law Court has held that employment discrimination cases brought under the MHRA are to be evaluated at the summary judgment stage according to "the special methodology" developed by the Supreme Court, including the burden shifting framework set out in the Supreme Court's *McDonnell Douglas* opinion. *Maine Human Rights Comm. v. City of Auburn,* 408 A.2d 1253, 1261–62 (Me.1979) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). In addition to Supreme Court

methodology, the Law Court has also held that other federal precedent should be used "as an aid in interpreting Maine's anti-discrimination provisions." *Bowen v. DHS,* 606 A.2d 1051, 1053 (Me.1992). *See also Higgins v. New Balance Athletic Shoe, Inc.,* 194 F.3d 252, 264 (1st Cir.1999) (approving use of *McDonnell Douglas* framework in connection with ADA claims of disability discrimination).

In order for Webber to succeed with his discrimination claims before the jury, he must be able to demonstrate: (1) that he qualifies for membership in a protected class; (2) that he was able to perform the essential functions of the job, either with or without reasonable accommodation; and (3) that International Paper discharged him in whole or in part because of membership in such class (i.e., because of discriminatory animus). *Lebron–Torres v. Whitehall Labs.,* 251 F.3d 236, 239 (1st Cir.2001). These are the basic elements of a discrimination claim.

In *McDonnell Douglas,* the Supreme Court created a burden shifting methodology whereby a plaintiff lacking direct evidence of discriminatory animus, the third element of a discrimination claim, might yet proceed to trial by proving a "prima facie case" of discrimination and by showing that the non-discriminatory reason the employer asserts for the adverse employment action is pretext for discrimination Accordingly, the elements of a prima facie case do not include proof of discriminatory animus. *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817. Essentially, the plaintiff need only demonstrate "that [he or] she is a member of a protected group who has been denied an employment opportunity for which [he or] she was otherwise qualified." *Marcano–Rivera v. Pueblo Int'l, Inc.,* 232 F.3d 245, 251 (1st Cir. 2000). In *Cruz–Ramos v. Puerto Rico Sun Oil Co.,* the First Circuit Court of

Appeals enumerated the following four elements of a prima facie case in the context of a reduction in force: (1) that the plaintiff was a member of a protected class; (2) that the plaintiff met the employer's legitimate job performance expectations; (3) that the plaintiff experienced adverse employment action; and (4) that the plaintiff retained non-class members in the same position or otherwise failed to treat the plaintiff's membership in the class neutrally in implementing the reduction in force. 202 F.3d 381, 384 (1st Cir.2000).

 International Paper asserts that the *McDonnell Douglas* methodology is called for because there is no direct evidence of discrimination. *Docket No. 11* at 3. Webber counters that direct evidence of a discriminatory discharge exists in Schaub and Moser's jokes concerning the "Costanza chair," Finley and Schaub's laughter concerning Webber's weight, and Thompson's statement to Webber, "You are the weakest link. You are gone." *Docket No. 14* at 16–17. Contrary to Webber's argument, none of these statements or events directly demonstrates that his position was eliminated because he was disabled or regarded as disabled. The following discussion therefore follows the *McDonnell Douglas* framework.

### 1. Webber succeeds in presenting a prima facie case of discrimination.

International Paper contends that Webber cannot make out a prima facie case of discrimination under *McDonnell Douglas*. International Paper takes issue only with the first and third aspects of Webber's prima facie case: membership in a protected class and adverse employment action. According to International Paper, Webber cannot show either because he was neither terminated nor disabled. *Docket No. 11* at 5, 8.

### a. Webber suffered an adverse employment action.

 International Paper's argument that Webber was not discharged concerns both his age and disability claims. Notwithstanding International Paper's argument that it still considers Webber an employee because he is on long term disability, *Docket No. 11* at 8, the facts clearly support a finding that Webber suffered an adverse employment action when International Paper eliminated his project engineer position, told him he would never work at International Paper again and escorted him from the premises. Webber has not worked at the Bucksport mill since that day. Furthermore, as a consequence of the reduction in force, Webber not only lost his position, but lost his wages and several employee benefits he previously enjoyed, including accidental death or dismemberment insurance, and matching 401k contributions. The fact that these events transpired is not erased by the subsequent job offer, though the offer might bear on back pay damages. *See, e.g., United States EEOC v. Massey Yardley Chrysler Plymouth*, 117 F.3d 1244, 1252 (11th Cir.1997) (affirming verdict for plaintiff where offer of reinstatement was made and discussing how said offer related to back pay damages).[7] Nor is the subsequent job offer an iron-clad defense to Webber's discrimination claim. It would be permissible for a factfinder to view it as a belated effort to make up for prior, discriminatory conduct, although that is certainly not the only way it might be viewed.

---

7. An employer "having once offered reinstatement, is released from the back pay obligation from the date the offer was rejected." *NLRB*

*v. Huntington Hosp., Inc.*, 550 F.2d 921, 924 (4th Cir.1977).

### b. Webber is disabled for purposes of the MHRA.

■ With respect to Webber's membership in a protected class, International Paper challenges only his claim of disability discrimination, not his claim of age discrimination. Although International Paper acknowledges that walking is a major life activity, it argues that Webber is not substantially limited in that activity because he is still able to drive, go grocery shopping, work in his garden, sweep floors in a gymnasium and walk one-half mile on a treadmill.[8] *Docket No. 11* at 6–7. Webber argues that he is disabled for purposes of both Maine and federal anti-discrimination law and also argues that the disability threshold set by the MHRA is lower than that set by the Americans with Disabilities Act. *Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, Docket No. 14,* at 4–5.

The MHRA defines physical disability in very broad terms:

> "Physical . . . disability" means any disability, infirmity, malformation, disfigurement, [or] congenital defect . . . caused by bodily injury, accident, disease, birth defect, environmental conditions or illness, and includes the physical . . . condition of a person that constitutes a substantial disability as determined by a physician . . ., as well as any other health or sensory impairment that requires special education, vocational rehabilitation or related services.

5 M.R.S.A. § 4553(7–A). As Webber argues in his opposition memorandum, this provision, on its face, is more generous than its ADA analogue, which expressly limits physical disability to those impairments that substantially limit a major life

activity. 42 U.S.C. § 12102(2). For example, a "congenital defect" might serve as a disability for purposes of the MHRA even though it had no impact whatsoever on a person's performance of major life activities. *Cf. Rozanski v. A–P–A Transport, Inc.,* 512 A.2d 335, 340 (Me.1986) (affirming lower court's recognition of asymptomatic spinal "malformations" as physical defects under the MHRA); *Maine Human Rights Comm'n v. Canadian Pacific Ltd.,* 458 A.2d 1225 (Me.1983) (same-involving asymptomatic heart murmur); *but see Winston v. Maine Tech. College Sys.,* 631 A.2d 70, 74 (Me.1993) (citing Me. Human Rights Comm'n, Employment Reg. § 3.02(C)(1) and seeking federal guidance in "determining when it is appropriate to impose categorical limits on the definition of a disabled individual"). While it is certain from the record that Webber has an "infirmity" that was caused by bodily injury, it is not so clear whether the physical limitations resulting from his knee replacement have substantially limited one or more major life activities, at least insofar as that standard has been applied by various federal courts.[9]

■ Ultimately, this legal issue does not need to be resolved. The facts indicate that Webber's supervisors at International Paper regarded Webber as having a physical disability, which is sufficient for purposes of both the MHRA and the ADA. Pursuant to 5 M.R.S.A. § 4553(7–B)(C), an " 'individual with a physical or mental disability' [includes] a person who . . . [i]s regarded as having a physical or mental disability." *See also id.* § 4572(2) (concerning "unlawful discrimination against qualified individual with a disability").[10]

---

**8.** Of course, only the last two of these activities necessarily involve walking.

**9.** Such as those cited by International Paper. *Docket No. 11* at 6–7.

**10.** Subsection 4572(2) addresses unlawful

The MHRA definition parallels the ADA definition, found at 42 U.S.C. § 12102(2), and federal cases construing the ADA language and regulations are therefore appropriate guides for construing the MHRA language.

■ Under the ADA, an individual is regarded as having a physical disability if his employer believes he has an impairment that substantially limits a major life activity, whether he is actually physically impaired or not. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). In *Sutton*, the Supreme Court held that severely myopic plaintiffs could not establish that they were regarded by their employer as substantially limited in the major life activity of working [11] simply because the employer considered them unable to work as "global airline pilots." *Id.* at 493, 119 S.Ct. 2139 ("Because the position of global airline pilot is a single job, this allegation does not support the claim that respondent regards petitioners as having a *substantially limiting* impairment."). The same fate has befallen numerous other ADA claimants who lost or were denied particular jobs and pursued ADA claims on the ground that they were regarded as substantially limited in the major life activity of working. *See, e.g., Murphy v. UPS*, 527 U.S. 516, 524, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999) ("At most, petitioner has shown that he is regarded as unable to perform the job of mechanic only when that job requires driving a commercial motor vehicle...."); *Bailey v. Georgia–Pacific Corp.*, 306 F.3d 1162, 1169–70 (1st Cir.2002) (affirming grant of summary judgment in absence of

any evidence that employer perceived plaintiff as "unable to work in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities"); *Lessard v. Osram Sylvania, Inc.*, 175 F.3d 193, 198 (1st Cir. 1999) (affirming grant of summary judgment where employer denied plaintiff one particular job due to plaintiff's physical infirmity); *Tardie v. Rehabilitation Hosp.*, 168 F.3d 538, 542 (1st Cir.1999) (affirming grant of summary judgment where plaintiff offered only that employer considered plaintiff unable to work more than 40 hours per week).

Webber's case is wholly different. First, Webber premises his suit on the major life activity of walking, not working. Second, Webber's summary judgment statement of material facts presents evidence that is directly related to International Paper's perception of him as an employee in need of substantial workplace accommodations due to a readily apparent physical infirmity that impedes his ability to walk. International Paper not only installed a stairway lift chair for Webber, at no small expense, but also significantly reduced his work schedule for an extended period of time and relocated his office from the third floor of the mill to the first floor of the mill. The fact that International Paper extended to Webber accommodations of this sort is sufficient to generate a genuine factual issue on the question of whether International Paper regarded Webber as substantially limited in the major life activity of walking. *Cf. Curry v. Empire Berol, U.S.A.*, 134 F.3d 370, 1998

---

discrimination in varying contexts, including discrimination in employment, whereas subsection 4572(1) addresses only employment discrimination.

**11.** The Court assumed, without deciding, that working is a major life activity, noting "that

there may be some conceptual difficulty in defining 'major life activities' to include work," because the operative issue in a disability suit is whether one has been denied work due to a disability. *Sutton*, 527 U.S. at 492, 119 S.Ct. 2139.

WL 13407, *4 (6th Cir.1998) (unpublished opinion) ("[W]e find nothing in the record to indicate that Empire regarded Curry as having an impairment that substantially limited his ability to work. Empire did nothing to limit Curry's work load or responsibilities although it was well aware of Curry's impairment."). Finally, the fact that International Paper approved Webber's application for long term disability benefits is also probative of whether it regarded him as disabled.[12] *Cf., EEOC v. Town & Country Toyota, Inc.,* 7 Fed. Appx. 226, 230 (4th Cir.2001) (unpublished opinion) ("An employer's comments referring to a plaintiff as 'disabled' are probative evidence that the employer regarded the plaintiff as disabled."). Because Webber succeeds in showing a prima facie case, a presumption of discrimination arises. *Gillen v. Fallon Ambulance Serv.,* 283 F.3d 11, 30 (1st Cir.2002). Accordingly, the burden now shifts to International Paper to demonstrate that the elimination of Webber's position was disability- and age-neutral.

### 2. International Paper has articulated a legitimate reason for eliminating Webber's position.

█ Once a plaintiff has made out a prima facie case of discrimination, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. 1817. International Paper states that, among other reasons, it "eliminated [Webber's] position because of a desire to increase efficiency." *Docket No. 11* at 9. International Paper explains that "other individuals were better able to perform the job duties of a project engi-

neer [because Webber] didn't have the skills to run the major projects like the few people that [sic] were left." This contention is supported by the fact that Webber was the only project engineer lacking an engineering degree and the fact that he tended to work on less complex construction projects. *Docket No. 11* at 10 (citing *Docket No 12,* ¶ 11). With this presentation, the presumption of discrimination evaporates and the burden returns to Webber.

### 3. Webber presents sufficient facts to support a finding that International Paper's explanation for his discharge is pretext for disability discrimination.

Should the defendant present a legitimate, non-discriminatory reason for an adverse employment action, the burden returns to the plaintiff, who must then show that the defendant's stated reason was, or is, pretext. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817. In this endeavor, the Court must "scrutinize the facts, indulging all reasonable inferences in [Webber's] favor, and ask whether the evidence conclusively demonstrates that [International Paper] acted on the basis of an objectively reasonable assessment of the appellant's capabilities and not on the basis of [his age or] impairment." *Gillen,* 283 F.3d at 30.

One of International Paper's justifications for selecting Webber's position, as opposed to another project engineer's position, is that Webber lacked an engineering degree. However, Webber has presented evidence that the lack of an engineering degree never was an issue with respect to his placement in the project engineer position and that all but one of the projects performed by project engineers since his

---

**12.** International Paper does not address in its principal memorandum whether Webber was regarded as disabled. Nor does International

Paper make any effort in its reply memorandum to refute Webber's assertion that he was regarded as disabled.

departure were within his general range of competence. Additionally, Webber presented evidence that the more complex project design functions once carried out by project engineers at International Paper have since been outsourced to engineering firms, which also calls into question the reason International Paper offers for Webber's discharge. Furthermore, Webber's performance reviews were all positive; his relative competence and efficiency was never called into question throughout his work history. Yet, despite this positive record, International Paper selected Webber for discharge first, ahead of another project engineer regarding whom Oettinger had received numerous internal complaints. Finally, there is evidence in the record that the chair lift accommodation International Paper provided to Webber was referred to by both Schaub and Moser, Webber's first- and second-line supervisors, as a "Costanza chair." Although this characterization could be interpreted in different ways by the jury, one legitimate inference would be that this characterization was derisive toward Webber and related to what Schaub and Moser perceived as a physical disability. Although the record indicates that Oettinger was the final decision maker, it also reflects that Oettinger consulted with both Schaub and Moser regarding his selection of Webber for the reduction in force.[13]

**4. *Webber does not present sufficient facts to support a finding that International Paper's explanation for his discharge is pretext for age discrimination.***

██ Webber's summary judgment statement of additional material facts fails to generate any facts probative of age discrimination and, therefore, summary judgment should enter against his age discrimination claim.

## Conclusion

For the reasons stated herein, I **RECOMMEND** that the Court grant, in part, and deny, in part, Defendant International Paper's Motion for Summary Judgment, as follows:

**DENY** the Motion with respect to Count I (disability discrimination); and **GRANT** the Motion against Count II (age discrimination).

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.

December 20, 2002.

---

**13.** I do not consider the 1997, weight-related wise-crack that Finley and Schaub shared at Webber's expense to reflect discriminatory attitudes toward either age or disability. Nor do I consider the "weakest link" comment by Thompson to be especially probative because there is nothing in the record linking Thompson to International Paper's decision-making process.