# United States Court of Appeals
## For the First Circuit

---

No. 02-1444

FRED J. CALEF, JR.,

Plaintiff, Appellant,

v.

THE GILLETTE COMPANY,

Defendant, Appellee.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, Chief U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Bownes, Senior Circuit Judge,
and Lipez, Circuit Judge.

---

Nancy Maule-McNally for appellant.

Richard P. Ward, with whom Anthony D. Rizzotti and Ropes & Gray were on brief for appellee.

---

March 11, 2003

---

**LYNCH**, **Circuit Judge**.  On December 6, 1996, Fred Calef was involved in an altercation at work at the Gillette Company which left his supervisor and co-workers fearing for their safety. Calef, who previously had received warnings following such incidents, was fired from his job at Gillette as a result.  Calef brought suit alleging that Gillette violated Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111-12117 (2000), by terminating his employment, failing to reasonably accommodate him, and harassing him.  He also brought a pendent state claim alleging his discharge was in violation of public policy.

The district court entered summary judgment against Calef and dismissed both his federal and state claims.  We affirm on two grounds:  Calef failed, within the summary judgment standard, to show that he was disabled, or that he was an otherwise qualified individual.

I.

We review the facts in this appeal from summary judgment in the light most favorable to Calef and take all inferences in his favor.  Rivas Rosado v. Radio Shack, Inc., 312 F.3d 532, 535 (1st Cir. 2002).

Calef worked as a Production Mechanic at Gillette from August 22, 1989 to December 13, 1996.  In the early 1990s Calef had several incidents with co-employees which led his supervisors to

-2-

make written reports. In 1990 he "had words" with a co-worker. On April 4, 1991 Calef and a co-worker each received a warning after an altercation in which Calef, in anger, had threatened the co-worker with physical harm after being so threatened himself. On March 10, 1992, Calef and another employee had to be physically separated by a supervisor after an incident in which the employees angrily exchanged insults and profanity and squirted oil on each other; Calef says the other employee squirted first. Six days later Calef was involved in another argument with a group leader. That night Calef got in a heated exchange with a different group leader and questioned the group leader's performance.

As a result of this series of confrontations with his supervisors and co-workers -- on April 4, 1991, March 10, 1992, and March 16, 1992 -- Gillette gave Calef a written warning, which, inter alia, said Calef was

> being told that actions of this nature will not be tolerated and any such actions in the future could result in a final warning which could ultimately lead to his termination from the payroll.

On September 13, 1995, Calef was involved in another incident, which resulted in his being issued a Final Warning. On that day, Calef had a confrontation with Jeanette St. Aubin, a machine operator who worked with him on the second shift. It was Calef's responsibility to investigate and repair the machines that St. Aubin operated when she reported trouble with them, as she did that day. After her encounter with Calef, St. Aubin, crying and

-3-

shaking, went to see supervisor Frank Sciarini in his office. She said Calef had harassed her about her inability to run machinery and that whenever she had difficulties with her machine, Calef got mad at her and told her to speak English. St. Aubin further reported that Calef had come to her machine, pointed his finger in her face, raised his hand, made a fist, and stated, "Stop calling me or I'll punch you in the face." Calef admits raising his voice toward St. Aubin and he admits that he threatened to hit her. At the time, St. Aubin was two weeks shy of her sixtieth birthday. Calef says St. Aubin poked him in the chest and scratched his hand. He then threatened to hit her but immediately apologized and said he did not mean it. Calef admitted he "displayed irrational behavior in the incident."

Calef's Final Warning, dated September 15, 1995, was issued "for a display of conduct that [was] detrimental to the interest of the Company." It explicitly warned Calef "that any single infraction of [Company] policy in the future will result in his termination from the payroll." Calef reviewed and signed the Final Warning without objection.

Pursuant to the written Final Warning, Gillette referred Calef to the Employee Assistance Program (EAP). In lieu of EAP counseling, he started therapy with Janis M. Soma in September 1995. Soma holds a Ph.D. but is not a medical doctor; we refer to her as "Dr. Soma." They first met on September 19, 1995. Dr. Soma

-4-

diagnosed Calef as having Attention Deficit Hyperactivity Disorder (ADHD). At her recommendation, Calef received counseling and obtained a prescription for Ritalin. Dr. Soma's notes indicate that Calef had conflicts with others both at work and outside of work. After the initial meeting with Dr. Soma, for example, Calef had an incident outside of work. Despite the counseling and medication, his problems with threatening others continued.

Calef says he began taking Ritalin in the fall of 1995 and took it in 1996. At his deposition, Calef testified that Ritalin "really helped" the symptoms of his ADHD. Specifically:

> It cleared my everyday function, I was doing things without thinking about them, about completing tasks, more focused, more - - it was like walking out of a fog and clearing everything up. With ADD I have to analyze a lot of things, and it's the turmoil of weighing things and balancing things before I actually do something typically, and with Ritalin it was clearing of - - very clear and - - everything was very clear.

His symptoms of ADHD disappeared or significantly diminished after he started taking Ritalin. Calef testified:

> Q: While you were working at Gillette, while you were on the job, during this period that you took Ritalin, OK, namely all of '96 when you were on the job, OK, did you have any effects of ADD while you were working or did the Ritalin control it?

> A: I'm sure Ritalin helped control most of it. Most all of it. I can't think of any that it didn't. Job performances were good.

On the specific question of his ability to manage his anger, Calef testified that his ADHD did not cause him to become

angry. Dr. Soma's testimony agrees. She added that people with ADHD deal with anger more impulsively. Further, in highly stressful situations, people with ADHD may not focus as well as others do.

In early 1996, Calef told a nurse in Gillette's Medical Department, Cynthia Ross, that he had ADHD. He also told Joan Pemberton, the head of the Medical Department. Both nurses say that Calef was adamant they not disclose to others the fact that he had ADHD and they did not disclose it.[1] There is a dispute about whether Calef's supervisors ever learned from the nurses or from another source that Calef had ADHD. We will infer in Calef's favor that Gillette had such notice.

In March 1996, Dr. Soma gave Calef a medical certificate to support his request for leaves under the Family and Medical Leave Act (FMLA). Calef was given over 40 days of FMLA leave between May and December of that year. In this sense, Calef requested and was given a reasonable accommodation. There was, though, evidence that Sciarini, the supervisor, did not like Calef taking FMLA days off.

---

[1] Pemberton said she asked Calef what accommodations he would need for the ADHD. "He said that no specific accommodations were necessary and that most of his problems were focused around anger management. We agreed that if he felt a need for a 'time out' from his work duties and needed a place to go as a result of any medical condition, Calef could come to the Medical Department." Calef never did so.

-6-

Calef says he had been assigned to work on updated versions of the machines that he had serviced earlier and he found the new setting stressful. On May 24, 1996, Dr. Soma addressed a note to the Gillette Medical Department saying she had advised Calef it would be in his best interests to reduce his stressors at work. In particular, she asked if there was a means to reverse his reassignment at work. The letter did not refer to either ADHD or a request for a reasonable accommodation. In Calef's favor we will infer that this letter was adequate to request a reasonable accommodation. Gillette declined to change his assignment. Calef did not pursue the matter.

On July 3, 1996, Calef checked into Pembroke Hospital for depression. On July 17, after returning from hospitalization, Calef received medical clearance from the Hospital to work at Gillette "without restrictions."[2] At his request, Gillette permitted him to work half days from July 22, 1996 through August.

Clinical notes from Dr. Soma indicate that, on August 16, 1996, Calef reported "good progress at work and in family. Sleeping well, blood pressure down, no alcohol use and no suicidal ideation." He continued to see Dr. Soma at times, and her November 19, 1996, note indicated Calef was taking Zoloft and felt it helped

---

[2] Calef says this information is irrelevant because the "without restrictions" referred only to depression, and not to ADHD. It is undisputed, however, that neither plaintiff nor Dr. Soma offered this clarification to Gillette or renewed their March request that his reassignment be rescinded.

him with anger management. Indeed, from his return on July 22, 1996 to December 6, 1996, Calef worked without noticeable incident or infirmity.

The incident which led to the termination of Calef's employment occurred on Friday, December 6, 1996. The day before, as was customary, Gillette sought volunteers for Sunday shifts. Mechanics usually like that shift since they receive double pay. Due to scheduling needs, the company had to know by Friday who would work that Sunday. Calef's group leader, Steven Pennington (who was senior to Calef and junior to Sciarini) asked for volunteers to work that Sunday and understood Calef to have volunteered. Calef's version is that he tentatively agreed to work and said he would get back to Pennington.

On Friday, December 6, management decided to run a particular production machine, thinking there was a danger of not meeting production quotas. At approximately 5:55 p.m., shortly before a meal break was scheduled to begin, Sciarini informed Pennington that the "Good News Plus" production machines would have to be run during the meal break. Pennington had short notice to find operators and mechanics who could run the machines during the break. Pennington attempted to find Calef in order to request that he delay his meal break and stay on duty while the machines were being run. However, Pennington was unable to locate Calef, so he arranged for another mechanic, along with some machine operators,

to oversee the operation of the Good News Plus machines during the break.

Calef was "disgusted" that his machines had been run during the meal break. When he returned from the break, he "went to Frank Sciarini's office and asked why [his] machines were being run." Pennington and Sciarini both state that Calef was upset and, despite being told why the machines had to be run during the break, Calef declared, "You know what you did to me."

Approximately two hours before the end of Calef's shift on that same Friday night, December 6, Calef approached Pennington and informed him that he would not work the shift on the following Sunday, December 8. Pennington had already scheduled Calef to work it. Calef says Pennington became angry and yelled at him that he had to work on Sunday. Calef then walked away from Pennington, who was asking for an explanation of why Calef would not work the Sunday shift. Calef says Pennington was angry and yelling at him, "That's it for you. We are going to get rid of you." Pennington says Calef angrily told him "you know what you did to me," which Pennington interpreted to be a reference to the decision to run the Good News Plus machines during Calef's meal break. Pennington continued to ask for an explanation, but Calef would not explain himself. Instead, he repeated, "You guys know what you did to me," and walked away. To Pennington, Calef seemed irrational and

increasingly erratic.  Because of Calef's actions, Pennington feared for his own safety.

The two men separated.  Pennington left Calef and reported the incident to Sciarini, his supervisor.  Pennington told Sciarini what had happened and reported that he was afraid of Calef, that Calef was acting erratically and that Pennington could not work with him.  Sciarini's notes of the incident, which he drafted the following day, state: "On Fri. Dec. 6, 1996, at 9:30 p.m., Steve Pennington my Group Leader came to my office telling me that he cannot work with Fred Calef.  I am afraid of him, he is acting crazy."

Sciarini asked Calef to report to him, which Calef did. The two then went to a nearby office, where Sciarini asked Calef for an explanation of what happened on the production floor and what he had said to Pennington.  Sciarini says he asked Calef if he was still receiving counseling and taking medication and that Calef replied that, while he was still in counseling, the only medication he was taking was blood pressure pills.  Calef says he was asked what drugs he was on and replied that he was taking only his blood pressure medication.

Calef says Sciarini was screaming at him, lunging over his desk at him, and telling him he was going to work on Sunday. Sciarini, for his part, observed that Calef was "barely coherent." When Sciarini tried to tell him that it was wrong to walk away from

a group leader, Calef repeatedly interrupted him, raised his voice and talked nonsensically. Calef was making statements such as "you never tell me anything," and was talking about how his wife was mad at him. Sciarini was very uncomfortable with Calef's behavior and he, too, began to fear for his safety. In his summary of the incident, Sciarini wrote that Calef's "behavior was out of control" at this point.

Sciarini believed that Calef's behavior might be explained by his being under the influence of illegal drugs. He requested Calef accompany him to the Medical Department, which Calef did. When Calef and Sciarini arrived, Ross, the nurse who was friendly with Calef, was on duty. Sciarini took Ross aside, explained what had happened, and requested a drug test.[3] Calef repeatedly insisted that the problem was not with him, but with his supervisors -- Sciarini and Pennington -- and that they, not he, should be required to take drug tests. Calef admits this and that he was speaking loudly.[4]

---

[3] In a Drug Test Request that Sciarini signed and Gillette's Manager of Health Services approved, Sciarini checked Calef's "unusual behavior" as the reason for requiring the test. He wrote that the behavior involved "acting funny and snaping [sic] back at my group leader and repeating we tell [him] nothing what's going on the floor." Sciarini also wrote that "my group leader is afraid to work with Fred."

[4] Sciarini's notes of the incident, written the day after the incident, reflect that:

> Fred said that Steve [Pennington] and I should take test also. The nurse [tried] to explain to him if you don't

A few minutes later Kristin Flanagan, a registered nurse scheduled to work the shift after Ross, arrived for duty. Flanagan is a veteran of the U.S. Air Force and served on active duty in the Persian Gulf during the Persian Gulf War. Even so, Ross did not feel comfortable leaving Flanagan as the only nurse on duty while Calef was in his agitated state.

Ross called for a security guard to come to the medical department and Gillette security member Tom Lonergan came to the area. Flanagan called the Manager of Gillette's Health Services, Joan Pemberton, at her home, explained the situation, and requested Pemberton's approval for a drug test.[5] Pemberton specifically recalls Flanagan saying that Calef scared her. Ross, who knew Calef, also feared for her safety at the time, and she was frightened by Calef's agitated and threatening manner. Calef appeared to her to be extremely irrational, belligerent, and sarcastic. Ross also said that Calef was extremely uncooperative, provocative, hostile, and threatening.

---

take the drug test, the consequences could result in loss of his job. Again my opinion his behavior was out of line. He was being very irrational and insisting that Steve and I should take a drug test and then proceeded to tell nurse that I drink 2 beers a day. He was rambling and incompetent at that time.

[5]    In filling out the necessary chain of custody forms for the drug test specimen, Flanagan noted that there was "Reasonable susp./cause" for the drug test.

Sciarini, Ross, and Flanagan explained to Calef that, pursuant to company policy, he was required to take the drug test. Calef eventually agreed to do so, but only after altering his consent form to read: "Requested Group Leader Steve Pennington to take same test." Flanagan administered the test, which later proved to be negative for illegal drugs.

Sciarini informed Calef that, because of his behavior, he was not to report to work over the weekend, and that he was to call Pemberton after 6:00 a.m. on the following Monday. Pursuant to Gillette policy, the medical staff could not let Calef drive himself home after taking the drug test. Flanagan and Ross wrote a contemporaneous report of the incident, which reflects that:

> [Calef] was requested to call his wife or friend to drive him home per policy. Calef said 'the package store is closing soon and all I want to do is drive home and stop at a bar for a drink.'

Calef eventually called his wife, who picked him up.

In a summary of the incident that Sciarini drafted the following day, he wrote:

> Later on Steve [Pennington] and I talked about the situation about Calef, Steve said that he did not yell at him. Both Steve and I feel uncomfortable working with [Calef] and for the safety of all the people working here has to be formost [sic] the greatest concern.

On the Monday following the incident, December 9, 1996, Pemberton had separate conversations with Flanagan and Ross to discuss the events involving Calef. The nurses told her their

-13-

recollections of the evening and, based on those conversations and her review of the nurses' written summary of the incident, Pemberton concluded that Calef's behavior had been completely inappropriate.

Also on Monday, Sciarini reported the events to manager Joseph Donovan. Donovan also received reports from Pemberton and the supervisors involved. Consistent with Gillette's regular business practice, Donovan then drafted an Employee Contact Report dated December 19, 1996. The report summarized the basis for his decision to terminate the plaintiff's employment, which was then reviewed and approved by his supervisor, Division Head John Farren. It is undisputed that Donovan made the decision to discharge Calef and that his stated reason for discharging the Plaintiff is set forth in the Contact Report. That report refers to Calef's disciplinary history, and describes the December 6 incident. The report says Calef's employment was being terminated because his behavior on that night was unacceptable; that it included insubordination and lack of cooperation with his supervisors when he refused a scheduled shift; and that Calef engaged in irrational behavior.

The report provided a synopsis of Donovan's investigation of the incident. Donovan reported on the discussion between himself and Sciarini as follows:

> Frank [Sciarini] felt Fred was out of control and that his facial expressions were irrational. Frank told me

-14-

(J. Donovan) that he felt uncomfortable working with Fred because of his behavior and was concerned about the safety of his people.

Donovan attempted to contact Calef by telephone in order to inform him of his decision. When he was unable to reach Calef, he requested that the company's personnel department send Calef a telegram, informing him of his employment termination. Western Union called Calef, who answered his phone, but refused to take the message. Accordingly, Gillette sent a copy of the termination message in the mail.

Gillette's Change In Status Form reflecting Calef's termination from employment states that the "specific reason for [his] termination" was "unacceptable behavior." In his Equal Employment Opportunity Commission (EEOC) charge, Calef stated that he was told by Donovan and Sciarini he was being fired for irrational behavior.

Calef says that he was disoriented, unfocused, and indecisive during these events of December 6. He says he was not screaming but did speak up "a little more than calmly, with a slightly raised voice." He admits he offended the nurses and that he was "real upset" and angry. He attributes all of this to his ADHD. He says under stress his ADHD symptoms of loss of coherent speech and thinking increased. Calef's basic position on the December 6 incident is that his behavior was caused by ADHD and that the reactions the Gillette employees had to him were

-15-

unreasonable and motivated by biases against people with disabilities.

After the incident he spoke to medical department personnel to apologize and asked them to speak to Donovan about his ADHD. A nurse later reported that she had done so, but Donovan's mind was made up. Calef also called Sciarini to apologize.

In his post-Gillette employment, Calef went to work as a mechanic with the Coca-Cola Company in a job he described as being similar to the one he had held at Gillette. He did not ever inform Coca-Cola that he had ADHD. Indeed, Calef held a series of positions (many of which did not work out for reasons other than ADHD) which required him to learn particular job skills. On one job evaluation Calef was said to be "[w]illing to learn and capable of doing so." He has been employed at Sears since April 2001, has never asked for an accommodation because of his ADHD, and testified that he learned needed skills for the job through a three-week, on-the-job training program.

## II.

Taking all inferences in his favor, Calef has failed to meet his burden of creating a triable issue that he was disabled under the terms of the ADA. A disability is an "impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2). Calef has not shown such an impairment. Nor has he shown, as he must, that he was qualified to perform the

-16-

essential functions of his job, either with or without reasonable accommodation.  See id. at § 12111(8).

A.  Substantially Limited in a Major Life Activity

Calef's argument that he was substantially limited in a major life activity rests, at its core, on evidence from Dr. Soma, his treating psychologist.  Dr. Soma's affidavit correctly recognized that the relevant disability determination turns not on the symptoms of untreated ADHD, but on Calef's ADHD when he received medication and counseling.  See Sutton v. United Air Lines, Inc., 527 U.S. 471, 483-84 (1999).  As to that, she opined, "At the time I treated him [in the mid-1990s], Calef was still substantially limited in the major life activities of learning and speaking (the latter more severe under high stress) notwithstanding his use of Ritalin."  Nonetheless, the Supreme Court has recently required more analysis than a doctor's conclusory opinion:

> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [that claimants offer] evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.

Toyota Motor Mfg., Inc. v. Williams, 534 U.S. 184, 198 (2002) (internal quotations and citations omitted).

It is this latter test, required by Toyota, which Calef fails.  Calef claims he is substantially limited in learning and

speaking.[6]  We start with the easier of the claimed limitations:
a limitation in learning.  On this record, no factfinder could
rationally find such a substantial limitation on learning exists.
The medical testing evidence does not support this claim.  A 1998
psychometric assessment of Calef concluded:

> scores of standard intelligence tests confirm clinical
> impressions, placing Calef's overall learning ability
> within the average range.  No important discrepancy is
> seen between verbal and non-verbal abilities.

> standard scholastic achievement tests show Calef's
> academic skills to be within the normal range for a man
> of his general abilities and educational level.

Calef relies on the fact that he scored "significantly
below average" in a test designed to measure his resistance to
distraction as tasks become increasingly more complex; he scored
"significantly below the mean" on a test designed to measure his
memory of complex visual organization and planning; he scored below
the 25th percentile when asked to recall "a spatial task involving
complex visual organization and planning"; he scored in the 16th
percentile in "awareness of visual detail in the environment and
visual sequencing ability"; he scored in the 2nd percentile "on a
psychomotor task involving the rapid copying of figures associated
with numbers"; and he scored in the 9th percentile "on a subtest
requiring the solving of oral arithmetic problems."  These factors

---

[6]     Plaintiff's earlier claims that he was substantially
limited in other major life activities have been abandoned on
appeal.

were taken into account in the conclusion that, overall, Calef's learning ability was in the average range. Further, a neurologist he consulted in 2000 reported that Calef said that Ritalin was "very effective in terms of his ability to concentrate, read, etc." but that Calef had stopped taking it because he thought it made him depressed.

More importantly, his life experience shows no substantial limitation on learning as required by Toyota. Calef has a high school GED, has taken other courses, and has received on-the-job training where he learned new job skills. His history both before and after Gillette shows no limitation in his learning ability. These facts doom the claim. See Bercovitch v. Baldwin Sch., 133 F.3d 141, 155-56 (1st Cir. 1998).

Calef's other asserted substantial limitation, in his speaking, fares no better. Both the medical assessment evidence and the evidence of his life experience render this claim meritless. A medical assessment conducted at the behest of Calef's own physicians reported that Calef "is attentive in conversation . . . . Language is normal." Indeed, a comprehensive neurological assessment conducted by Peter Rosenberger, M.D., the Director of the Learning Disorders Unit at Massachusetts General Hospital, concluded that Calef's verbal abilities were within average range, including his verbal productivity, articulation, fluency, grammar

-19-

and syntax, and vocabulary. Psychometric testing performed by Dr. Rosenberger's clinic further concluded:

> Statistical analysis indicates that [Calef's] verbal comprehension abilities fall within the average range (53rd %ile Index Score = 101) . . . . Vocabulary development and general fund of information fall at the mean (50th %ile).

There is no medical evidence to contradict these conclusions.

There was no evidence that Calef could not perform the variety of speaking tasks central to most people's lives, outside the workplace as well as within. See Toyota, 534 U.S. at 200-01. His job required him to speak with customers, supervisors, and others, and he did so satisfactorily. None of his performance evaluations note any difficulty in speaking. Further, to the extent ADHD was an impairment, a court is required to take into account the plaintiff's "ability to compensate for the impairment." Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565 (1999). Here, Calef compensated through Ritalin and counseling. His own testimony was that in 1996 Ritalin helped control most of the effects of ADHD while he was working: "Most all of it. I can't think of any that it didn't." Nor is there any evidence of difficulty in speaking in Calef's everyday life.

At most, Calef's evidence was that, despite taking Ritalin, he still had some difficulty in concentrating at work and would blurt out or interrupt people in conversation. There is no evidence at all that he was substantially limited in speaking

-20-

outside of work. This is not enough to show a speaking disability under the ADA.

To support his claim, Calef focuses on regulations promulgated by the EEOC. See 29 CFR § 1630.2(j)(1) (2002).[7] Like the Supreme Court in Toyota, we do not pass on the validity of these regulations. Even if they are valid, his claim fails. The regulations must be read in light of "the fundamental statutory requirement that only impairments causing 'substantial limitations' in individuals' ability to perform major life activities constitute disabilities." Albertson's, 527 U.S. at 565. Even under the EEOC regulations, Calef has not created a triable issue of fact that he is, as the regulations would require, "significantly restricted" as to the "condition, manner or duration" under which he either learns or speaks as compared to the average person in the population. A significant restriction does not mean a "mere difference." Id. There is no evidence that Calef could not learn or speak during the activities of everyday life. At most there was evidence that sometimes -- but not always or even predominantly -- Calef found it

---

[7]     That regulation reads:

(1) The term substantially limits means:
    (i) Unable to perform a major life activity that the average person in the general population can perform; or
    (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

-21-

difficult to handle stress. Indeed, there were undoubtedly times of stress in the fifteen months between September 15, 1995, when he was diagnosed, and December 6, 1996. But there was only one instance of uncontrolled anger reflected in the record, and that was on December 6.

Even Dr. Soma stated that while ADHD is a lifelong condition, it "<u>may</u> involve <u>episodic</u> incapacity during periods of high stress." As to the duration and frequency of episodes of incapacity, Dr. Soma said, "Incapacity will occur <u>infrequently</u> and is likely to involve <u>periods</u> <u>of</u> <u>short</u> <u>duration</u>." This statement, made in a March 1996 certificate, referred to Calef's ADHD and was part of his request for short leaves of absence -- a request Gillette granted. Calef's post-Gillette work history also evidences the episodic and infrequent nature of any incapacity. Calef's evidence is totally unlike the evidence presented by plaintiff in <u>Gillen</u> v. <u>Fallon Ambulance Service, Inc.</u>, 283 F.3d 11 (1st Cir. 2002), where we found a triable issue of disability by a one-armed ambulance attendant who had significant difficulty lifting objects. Calef, in contrast, fails the test for significant restriction as to the condition, manner, and duration for either learning or speaking.

In the end, Calef's argument devolves into a claim that ADHD makes it more difficult for him to respond to stressful situations, that when he becomes angry, he sometimes loses control

-22-

and can neither speak nor think well, and that this constituted a substantial limitation on a major life activity. It is clear, though, as Dr. Soma's affidavit indicates, that the ADHD does not cause him to become angry. The issue is how he handles his resulting stress during the episodes in which he becomes angry. This claim would not, under Toyota, qualify as a substantial limitation on a major life activity. Very few people find handling stress to be easy. Many people do not think well in stressful situations and find it harder to speak well. There was no evidence in this record that plaintiff could not perform some usual activity compared with the general population, or that he had a continuing inability to handle stress at all times, rather than only episodically. Under our caselaw, these shortcomings in the evidence are fatal. See Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 31-32 (1st Cir. 2000) (even assuming ear impairment was a potential long-term condition, there was no evidence that it had a severe impact on plaintiff's functional ability to hear); Soileau v. Guilford, 105 F.3d 12, 15-16 (1st Cir. 1997) (plaintiff's inability to get along with others is not a substantial limitation).

On different facts, ADHD might disable an individual such that the ADA applies. Calef, however, has not made the individualized showing about his particular limitations that Toyota requires. Merely pointing to a diagnosis of ADHD is inadequate.

B.  Qualified Individual

Even if Calef were arguably disabled, he is not otherwise a "qualified" employee because, with or without accommodation, he could not perform an essential function of the job.[8]  See 42 U.S.C. §§ 12111(8), 12112(a).  Plaintiff bears the burden of showing he is qualified.  Laurin v. Providence Hosp., 150 F.3d 52, 56 (1st Cir. 1998).

An employer may base a decision that the employee cannot perform an essential function on an employee's actual limitations, even when those limitations result from a disability.  Leary v. Dalton, 58 F.3d 748, 753-54 (1st Cir. 1995) (under Rehabilitation Act, employee with excessive absences related to claimed disability was not qualified individual); see also Mole v. Buckhorn Rubber Prods., 165 F.3d 1212, 1217 (8th Cir. 1999) (plaintiff whose work had deteriorated as a result of claimed disability and resulting depression was not otherwise qualified).  The statute requires that consideration "be given to the employer's judgment as to what functions of a job are essential."  42 U.S.C. § 12111(8).  It is an

_____

[8]    An employer has no duty to modify an essential function of a job.  If the plaintiff, with or without reasonable accommodation, cannot perform an essential function of the job, then he is not a qualified individual and there is no duty to accommodate.  The essential function analysis is "conceptually distinct from, though it frequently overlaps with, the undue hardship defense."  1 H.H. Perritt, Jr., Americans With Disabilities Act Handbook, § 4.19 at 126 (3d ed. 1997).  The inquiry into essential functions is not intended to second-guess an employer's business judgment regarding production standards.

essential function of a job that a production manager be able to handle stressful situations (here, requests for overtime work and routine disagreements) without making others in the workplace feel threatened for their own safety. This function is both job-related and consistent with business necessity.

Gillette has consistently disciplined employees who engage in such behavior and who are unable to handle this essential function. Before Calef knew he suffered from ADHD, Gillette applied those standards to him.[9] In 1993 he was warned about his confrontations with co-workers. In 1995 he was warned his employment would be terminated the next time he threatened an employee. Gillette has also terminated the employment of others who display similar behavior.[10]

Put simply, the ADA does not require that an employee whose unacceptable behavior threatens the safety of others be retained, even if the behavior stems from a mental disability.

_____

[9] As to Calef's argument that this is a "perceived to be disabled" case, there is not a whiff of proof that the fears of the nurses and supervisor were motivated by stereotypes about the disabled. Even on plaintiff's version of the facts of that night, the reported reactions of the supervisors and nurses were entirely reasonable, and there is no evidence they were not genuine.

[10] Calef mistakes the role of the "direct threat" defense, which is separate from the question of whether he is otherwise qualified. In EEOC v. Amego, Inc., 110 F.3d 135, 144 (1st Cir. 1997), this court rejected the argument that a court could never consider threat to others as part of the otherwise qualified analysis, but was required to view it only under the direct threat defense.

-25-

Such an employee is not qualified.[11]  That was the point of our decision in EEOC v. Amego, Inc., 110 F.3d 135 (1st Cir. 1997).  It is also the view of every other circuit case which has addressed a similar situation under the ADA or the Rehabilitation Act.  See Palmer v. Circuit Court, 117 F.3d 351 (7th Cir. 1997); Johnson v. N.Y. Hosp., 96 F.3d 33 (2d Cir. 1996) (per curiam); Williams v. Widnall, 79 F.3d 1003 (10th Cir. 1996); Crawford v. Runyon, 79 F.3d 743 (8th Cir. 1996); see also Bercovitch, 133 F.3d at 154-55 (plaintiff who cannot meet school disciplinary requirements is not otherwise qualified); Adams v. Alderson, 723 F. Supp. 1531, 1532 (D.D.C. 1989), aff'd 1990 WL 45737 (D.C. Cir. 1990) ("One who is unable to refrain from doing physical violence to the person of a supervisor, no matter how unfair he believes the supervision to be or how provocative its manner, is simply not otherwise qualified for employment."); cf. Reed v. LePage Bakeries, Inc., 244 F.3d 254,

---

[11]    It is questionable whether the reasonable accommodation analysis plays any role in such a case.  See Palmer v. Circuit Court, 117 F.3d 351, 353 (7th Cir. 1997).  Calef never renewed his request to be moved to different machines.  Further, he was given medical clearance to return to work without restriction in July.  Finally, there is no evidence at all connecting the denial of that request, some nine months before, with the events of December 6.

Even if reasonable accommodations were pertinent, there was no reasonable accommodation which would have enabled him to perform the essential functions of his job.  His uncontrollable anger was episodic and unpredictable. As the district court held, "These short leaves [are] not going to alleviate the threatening and abusive behavior because the stress arises out of the job." Gillette had tried to accommodate Calef -- it had given him time off and reduced his work schedule when requested.  That did not prevent his behavior on December 6.

262 (1st Cir. 2001) ("The ADA is not a license for insubordination in the workplace.").

C.  Sunday Closing Law

We have reviewed the evidence and the law on Calef's pendent claim that a termination for failure to work on Sunday violated public policy; we find the claim is without merit.  There is no violation of public policy.  Mass. Gen. Laws ch. 136 § 7 (2002) allows companies to be open for work on Sunday provided a permit is obtained.  Gillette had obtained the permit.  Calef is not free to make a violation of public policy argument simply because he disagrees with the grant of the permit.

D.  Conclusion

We **affirm** the entry of summary judgment for Gillette dismissing all claims.  Costs are awarded to Gillette.

**\*Dissent follows\***

**BOWNES, Senior Circuit Judge (concurring in part, dissenting in part)**. I concur with Part II(C) of the majority's opinion regarding Calef's state law claim. I write separately, however, because I disagree with the majority's analysis of the Americans with Disabilities Act ("ADA"). I must acknowledge that Fred Calef is not the most sympathetic ADA plaintiff. As the majority points out, he threatened to hit a 60 year old woman and scared a Gulf War veteran. This court, nevertheless, has a duty to remain faithful to our precedent and the relevant laws applicable to this case. We should take extra care not do more harm than good where the plaintiff is not a nice person. We must make sure that our opinion does not create bad precedent from which all future plaintiffs will suffer. I am concerned that is what is happening here. I must therefore respectfully dissent.

At the heart of my concern is that the majority does not adequately address the relevant Equal Employment Opportunity Commission ("EEOC") regulations. Until now, every case in this circuit that has revolved around the issue of whether a plaintiff was "substantially limited" in a major life activity has used the EEOC regulations for guidance. At times, the majority misapplies the EEOC regulations. At others, the majority does not use them at all. I believe we should follow our past practice of using the EEOC regulations for guidance and apply them to this case.

I also dissent because the majority's analysis places emphasis on facts that are entirely irrelevant under our case law. Those facts involve the subjective fear felt by the Gillette nurses and Calef's immediate supervisor. Their fear is a theme that runs throughout the majority's opinion. It is mentioned in the very first sentence of the opinion, and then again at least eight times in the majority's fact section alone. Unfortunately, the majority treats fear as more than just a theme. The majority, incorrectly in my view, incorporates fear directly into its analysis of whether a person is "otherwise qualified." To make matters worse, the majority's "otherwise qualified" analysis is complete dicta. Having found that Calef was not disabled under the ADA, there is simply no reason for the majority to expound on whether he was "otherwise qualified." Because I do not consider it wise to make unnecessary pronouncements on the law, and because I believe the substance of the majority's "otherwise qualified" analysis is incorrect, I must dissent.

Lastly, I dissent because the majority opinion is not faithful to the summary judgment standard. Under that standard, we are to examine the facts in the light most favorable to the nonmovant, Calef, drawing all reasonable inferences and resolving all factual conflicts in his favor. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 18 (1st Cir. 1999). A motion for summary judgment should only be granted if "the evidence, viewed from the

-29-

perspective most favorable to the non-movant, is so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." FHS Props. Ltd. P'ship v. BC Assocs., 175 F.3d 81, 85 (1st Cir.1999) (citation omitted). In its description of the facts, the majority fails to cite certain material evidence that is beneficial to Calef. Based upon these omissions, as well as those facts which are discussed, it is my view that reasonable minds could differ as to the outcome of this case. The majority's claim that reasonable minds could not differ is undermined by the fact that the district court judge in the proceedings below ruled that Calef was disabled.

## I. BACKGROUND

A. Facts

Much of the evidence that the majority fails to take into account relates to the events leading up to and during December 6, 1996. In mid-1996, Calef was assigned to work on new computerized machines in a high traffic area of Gillette's production facility. Calef was upset by the new assignment and told one of his supervisors, Frank Sciarini ("Sciarini"), that he could become sick because of the stress of working on the new machines. Calef also spoke with his psychologist Dr. Janis Soma ("Dr. Soma") about the problem. On May 24, 1996, Dr. Soma wrote a note to Gillette's medical department requesting that Calef be re-assigned to machines he had previously worked on. Dr. Soma also advised Gillette that

Calef was at serious risk for significant health problems and that maintaining a familiar work environment would be helpful. Calef took the note to work and showed it to a nurse in the medical department. Calef also showed the note to Sciarini. Sciarini read the note and Calef told Sciarini that he had ADHD, but Sciarini refused to reassign him. Calef also took the note to Sciarini's supervisor, Joe Donovan ("Donovan"), who was the Gillette manager that ultimately decided to terminate Calef's employment. Donovan read the note and Calef told Donovan that he had ADHD, but Donovan also refused to reassign him.

On December 5, 1996, Calef's supervisor Steve Pennington ("Pennington") asked for volunteers to work the coming Sunday. Calef expressed an interest in working, but did not make a firm commitment. On December 6, 1996, Calef had a disagreement with his supervisors about a machine on which Calef had worked. After the disagreement ended, Calef informed Pennington that he would not work on Sunday. Calef said that he had already worked the two previous weekends and could not find a babysitter for his children. An argument promptly erupted, with Pennington yelling at Calef for refusing to work on Sunday.

Pennington reported to his immediate supervisor, Sciarini, that Calef was "acting strange again like he was not taking his medication again." Sciarini took Calef into an office and yelled at him for refusing to work on Sunday. Sciarini

believed that Calef's behavior "was out of control and his facial expressions were irrational." Sciarini asked Calef "if he was still under counseling and taking his medication." Sciarini also suspected that Calef might be using illegal drugs and demanded that Calef report to the company nurse and submit to a blood test. Calef went to the nurse's office, but refused to take the blood test. At the nurses office, Sciarini described Calef as "rambling and incompetent." Calef admits that he was incoherent and could not follow instructions. The two nurses on duty said Calef had difficulty following instructions, paced back and forth, and kept repeating the same questions. One nurse said that Calef's concentration was so poor that they had to explain certain policies to him a total of five times. The nurses also had to repeatedly instruct Calef how to fill out simple paperwork, including signing his own initials. One nurse described the situation as follows:

> Mr. Calef was unable to focus his thoughts and became more and more agitated. Mr. Calef's face was red, he was speaking quickly and in a raised voice, and he kept saying that the problem was not with him, but with his supervisors, Mr. Sciarini and Steve Pennington.

At no time did Calef become violent or threaten anyone with violence. Calef eventually agreed to take the blood test when a nurse explained that he could be fired if he continued to refuse. After taking the blood test, Calef was sent home, placed on medical leave, and instructed to remain at home until the results of the blood test were known. Although the blood test results came back

negative for illegal drugs, Gillette sent Calef a telegram on December 13, 1996, stating that his employment had been terminated for "refusal to work scheduled overtime and failure to cooperate with your group leader and supervisor."

In December, 1997, Dr. Soma referred Calef to the Massachusetts General Hospital Learning Disorders Unit to undergo a battery of psychometric tests.  On the day of the tests, Calef had taken Ritalin for his ADHD.  The tests consisted of several subtests designed to measure his intelligence, attention, auditory and visual functions, and his academic abilities.  Calef scored within the average range on some of the subtests, but scored far below the average on others, including subtests designed to measure his resistence to distraction, awareness of visual detail, and verbal abilities.  The Learning Disorders Unit concluded from the tests that "attention deficit is an important cognitive handicap for this otherwise normally intelligent gentleman."

There are other facts that the majority fails to discuss and these will be addressed below at the appropriate time.

B.  Procedural History

The majority also does not discuss the procedural history of this case or the district court's rulings below.  Calef's complaint in the district court alleged that Gillette failed to reasonably accommodate his ADHD and that Gillette terminated his employment because of his disability in violation of the ADA.

Calef claimed he was disabled because ADHD substantially limited the major life activities of learning and speaking, including communicating, thinking and concentrating, and that his ADHD worsened under stress.

The district court, in a ruling issued from the bench, granted Gillette's motion for summary judgment. The district court found Calef to be disabled within the meaning of the ADA as to the major life activity of "speaking while under stress." Nevertheless, the district court determined that summary judgment was proper because there was no evidence that Gillette knew of Calef's disability, no evidence that Calef sought a reasonable accommodation for his disability, and no evidence of discriminatory animus on the part of Gillette. The district court further held that Calef's disability arose from the stress of his job, which therefore made him not "otherwise qualified" as required by the ADA.

## II. THE MAJORITY'S MISAPPLICATION OF THE EEOC REGULATIONS

The ADA prohibits an employer from discriminating against a qualified individual because of that person's disability. 42 U.S.C. § 12112(a). To survive on summary judgement, Calef must produce enough evidence from which a reasonable jury could conclude that he was disabled within the meaning of the ADA, that with or without reasonable accommodation he was able to perform the essential functions of the job, and that Gillette terminated his

-34-

employment, in whole or in part, because of his disability. See Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002); Criado v. IBM Corp., 145 F.3d 437, 441 (1st Cir. 1998). The ADA defines the term "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12102(2)(A). I respectfully disagree with the majority's analysis of whether Calef is "substantially limited" in a major life activity.[12] First, I believe the majority misreads the relevant EEOC regulations, which this court has repeatedly used for guidance in determining if an individual is "substantially limited."

The EEOC regulations interpreting the ADA define "substantially limited" to mean either: "(i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the

---

[12] A "major life activity" is an activity that is of central importance to most people's daily lives. Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). Calef contends that his ADHD affects the major life activities of learning and speaking, including communicating, thinking and concentrating. In the past, this court has treated communicating, thinking and concentrating as being subsumed by the broader activities of learning and speaking. See Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C., 258 F.3d 30, 33 n.4 (1st Cir. 2001). There is no question that learning and speaking are major life activities of central importance to most people's daily lives. See Whitney, 258 F.3d at 33 (learning); Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 30 (1st Cir. 2000) (speaking); Bercovitch v. Baldwin Sch., Inc., 133 F.3d 141, 155 (1st Cir. 1998) (learning); 29 C.F.R. § 1630.2(i).

condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (emphasis added). With respect, I believe the majority misconstrues the differences between these two prongs and thereby sows confusion for future litigants.

The majority contends that Calef is not substantially limited in speaking or learning. As far as speaking is concerned, the majority says that Calef's psychometric tests show he possesses the verbal abilities of an average person. The majority also points to Calef's own deposition testimony that he successfully speaks face-to-face, as well as over the telephone, with customers and supervisors as part of his new job repairing household appliances. As for learning, the majority highlights the undisputed fact that Calef obtained his General Equivalency Diploma, took other courses, and received on-the-job training. Put simply, the majority's argument is that Calef can learn and speak, and therefore cannot be considered "substantially limited" for purposes of the ADA.

I agree with the majority that the record is replete with evidence that Calef can actually speak, and can actually learn. I therefore agree that Calef does not meet the first prong of the EEOC regulations. See 29 C.F.R. § 1630.2(j)(1)(i). This brings me

-36-

to the second prong of the regulations. The majority says that Calef does not meet the second prong because "[t]here is no evidence that Calef could not learn or speak during the activities of everyday life." I respectfully submit that this reasoning is illogical. In essence, the majority is saying that Calef does not meet the second prong of the EEOC guidelines because he does not meet the first. Under the majority's view, the analysis should be confined only to what Calef can and cannot do. This necessarily means ignoring the second prong of the EEOC regulations, which recognizes that a person who accomplishes major life activities can nevertheless be "substantially limited" if they are significantly restricted as to the condition, manner or duration under which they perform those major life activities, as compared to the average person in the general population. See id. § 1630.2(j)(1)(ii).

The constricted analysis the majority adopts is unsupported by Supreme Court precedent and inconsistent with our prior opinions. The Supreme Court has stated that the ADA "addresses substantial limitations on major life activities, not utter inabilities," and that "[w]hen significant limitations result from the impairment, the [disability] definition is met even if the difficulties are not insurmountable." Bragdon v. Abbott, 524 U.S. 624, 641 (1998). This court has also recognized that an impairment can "substantially limit" a person's major life activities, even though it is possible for that person to actually engage in those

activities.  See Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 22 (1st Cir. 2002).

In Gillen, a woman with an amputated arm wanted to be an emergency medical technician ("EMT"), but the defendant-employer would not hire her because it claimed she could not lift a certain amount of weight.  283 F.3d at 19.  The woman then obtained a different EMT job with another employer, and in doing so, demonstrated her ability to lift the amount of weight that the defendant originally claimed she could not lift.  In a suit by the woman against the first employer, the district court found that the woman was not disabled under the ADA because by demonstrating that she could lift the required amount of weight, she had shown that she was not "substantially limited" in a major life activity.  We disagreed, and held that the woman's amputated arm represented a substantial limitation on her ability to lift, "notwithstanding her extraordinary efforts to compensate for her impairment."  Id. at 23.  We explained that "[t]he key question is not whether a handicapped person accomplishes her goals, but whether she encounters significant handicap-related obstacles in doing so."  Id. at 22.

The majority's analysis of the EEOC guidelines is flawed for another reason.  To decide whether a plaintiff is "substantially limited," be it under the first or second prong of the EEOC regulations described above, the EEOC regulations state

that three factors should be considered.  29 C.F.R. § 1630.2(j)(2).
Those three factors are:  the duration or expected duration of the
impairment; the nature and severity of the impairment; and the
long-term impact or expected long-term impact resulting from the
impairment.[13]  See id.  Time-and-again we have used these three
factors as guidance to determine whether a plaintiff is
"substantially limited."  See Gonzalez v. El Dia, Inc., 304 F.3d
63, 73 (1st Cir. 2002); Carroll, 294 F.3d at 239; Gillen, 283 F.3d
at 21; Navarro, 261 F.3d at 98; Whitney, 258 F.3d at 33; Santiago
Clemente, 213 F.3d at 30-31; Quint v. A.E. Staley Mfg. Co., 172
F.3d 1, 10 (1st Cir. 1999); Criado, 145 F.3d at 442; Soileau v.
Guilford of Me., Inc., 105 F.3d 12, 15 (1st Cir. 1997); Katz v.
City Metal Co., Inc., 87 F.3d 26, 31 (1st Cir. 1996).  We have done
so because the regulations "constitute a body of experience and
informed judgment to which courts and litigants may properly resort
for guidance."  Santiago Clemente, 213 F.3d at 30 n.2 (quoting
Bragdon, 524 U.S. at 642).  The majority, however, does not cite or
discuss these three factors.  Moreover, the majority does not
explain to future litigants why it chooses not to apply the three
factors, or what considerations take their place.  In light of the
fact that neither Calef nor Gillette challenges the EEOC

---

[13]    The distinction between duration and long-term impact
is that duration refers to the length of time an impairment
persists, while long-term impact refers to the residual
effects of an impairment.  See Navarro v. Pfizer Corp., 261
F.3d 90, 98 (1st Cir. 2001).

regulations, we should continue our well established practice of relying on them for guidance.[14]

I close this portion of my dissent with one final observation of the majority's "substantially limited" analysis. The majority says that the Supreme Court's opinion in Toyota requires that we examine Calef's speaking and learning both "outside the workplace as well as within." This is a subtle but profound expansion of Toyota's holding. In Toyota, the Supreme Court stated:

> When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job.

534 U.S. at 200-01 (emphasis added). The Court went on to reject the notion that "whether an impairment constitutes a disability is to be answered only by analyzing the effect of the impairment in the workplace." Id. at 201. It seems evident that these sentences are the basis for the majority's conclusion that Calef's speaking and learning must be examined outside the workplace as well as within. But that conclusion does not fully consider the reasoning

_____

[14] In Toyota the Supreme Court questioned the persuasive authority of the EEOC regulations, but declined to decide the issue because, like the parties here, neither of the litigants contested the matter. Since Toyota, we have continued to use the EEOC regulations for guidance. See, e.g., Gonzalez, 304 F.3d at 73; Carroll, 294 F.3d at 239; Gillen, 283 F.3d at 21.

behind the Supreme Court's holding in <u>Toyota</u>. As the Court explained, the "critical[]" reason behind its decision was that "the manual tasks unique to any particular job are not necessarily important parts of most people's lives." <u>Id.</u> In contrast, there is no doubt that speaking and learning are central to most people's daily lives. See <u>Whitney</u>, 258 F.3d at 33 (learning); <u>Santiago Clemente</u>, 213 F.3d at 30 (speaking).

I respectfully submit that extending this portion of the Court's holding in <u>Toyota</u> to other types of major life activities, such as speaking and learning, is unwarranted. Doing so means that people with learning disabilities will now be required to produce evidence that shows their learning is impaired at work and at outside of work. Failure to produce both types of evidence will result in dismissal of their claim on summary judgment. This onerous requirement conflicts with the recognition that a plaintiff's evidence "need not necessarily be composed of excruciating details as to how the plaintiff's capabilities have been affected by the impairment." <u>Gillen</u>, 283 F.3d at 24 (citing <u>Albertson's, Inc.</u> v. <u>Kirkingburg</u>, 527 U.S. at 555, 566 (1999)).

## III.  THE MAJORITY'S MISAPPLICATION OF
## THE FACTS TO THE LAW

This brings me to my concern regarding the majority's description of the evidence in this case.  The majority fails to discuss certain relevant facts that are beneficial to Calef, which is required at the summary judgment stage.  See Conward, 171 F.3d at 18.  These omitted facts pertain mostly to Calef's behavior on December 6, 1996, although there are others.  Considering these omitted facts through the prism of the three EEOC factors, it seems clear to me that a reasonable jury could find that, despite taking Ritalin and undergoing therapy, ADHD substantially limited the condition, manner, or duration of Calef's learning and speaking.  Specifically, Calef has presented evidence that his impairment was of significant duration, that his impairment was at times severe, and that the impairment's impact was long-term.

Calef has presented evidence that his ADHD is an impairment of significant duration.  See 29 C.F.R. § 1630.2(j)(2)(ii).  Calef testified that ADHD affected him when he was young and made it difficult for him to do school work.  In addition, Dr. Soma stated in her affidavit that it was her opinion that Calef's learning difficulties extended back to his time in school.  Even more significant is Calef's testimony that, in the years following his employment at Gillette when he was not taking Ritalin, his concentration was so poor that he could not read more than one or two paragraphs without losing complete focus.  My

conclusion regarding the duration of Calef's impairment comports with our previous characterization of ADHD as "a permanent disability." See Criado, 145 F.3d at 442.

Second, Calef produced evidence that his impairment, at least at times, was severe. See 29 C.F.R. § 1630.2(j)(2)(i). The set of statements by Calef's supervisors and the nurses describing the December 6, 1996, incident demonstrate that Calef had significant concentration problems. The two nurses reported that Calef "was unable to follow simple directions." They claimed that Calef "[r]epeatedly had to be redirected on what to do and why," even for matters as basic as signing his initials. In fact, the nurses had to explain some procedures to Calef five times. Calef's supervisors confirmed the nurses' observations, stating that "Fred's behavior was erratic. He was unable to follow simple commands and to focus his thoughts when questioned." Moreover, all parties agree that Calef's speaking was incoherent, that he rambled and repeated the same questions over again.

Lastly, Calef submitted evidence that the impact of his impairment was long-term, even when taking Ritalin. See 29 C.F.R. § 1630.2(j)(2)(iii). Calef testified that, despite taking Ritalin, he had difficulty concentrating on repairing machinery at work, had difficulty reading the company bulletin board, and would blurt out or interrupt people during conversations. These difficulties occurred before the incident on December 6, 1996. In addition, the

psychometric tests, which were administered almost a year after Gillette terminated Calef's employment, and conducted on a day that Calef had taken Ritalin, indicate that the impairment's impact was long-term.  The test results show that Calef scored within the average range on some subtests, but far below the average on others.  His below average performances involved subtests designed to measure his attention, concentration and verbal abilities.[15]  As a result, a doctor at Massachusetts General Hospital concluded that "these test scores confirm the clinical impression that attention deficit is an important cognitive handicap for this otherwise normally intelligent gentleman."

It is important to recognize that this case is distinguishable from others in which we have found insufficient evidence of a disability; largely because Calef has presented evidence pertaining to all three of the factors we use to guide our analysis of whether a plaintiff is "substantially limited."  Cf.

---

[15]  For example, Calef scored "significantly below average" in a test designed to measure his resistence to distraction as tasks became increasingly more complex; he scored "significantly below the mean" on a test designed to measure his memory of complex visual organization and planning; he scored below the 25th percentile when asked to recall "a spatial task involving complex visual organization and planning"; he scored in the 16th percentile in "awareness of visual detail in the environment and visual sequencing ability"; he scored in the 2nd percentile "on a psychomotor task involving the rapid copying of figures associated with numbers"; and he scored in the 9th percentile "on a subtest requiring the solving of oral arithmetic problems."

<u>Carroll</u>, 294 F.3d at 241 (no evidence that symptoms persisted); <u>Whitney</u>, 258 F.3d at 34 (impairment was mild, reversible and short lived); <u>Santiago Clemente</u>, 213 F.3d at 32 (impairment was temporary and no evidence of long-term impact); <u>Bercovitch</u>, 133 F.3d at 155-56 (no evidence of severity); <u>Soileau</u>, 105 F.3d at 15-16 (no evidence of severity or long-term impact). This is not to say that plaintiffs <u>must</u> present evidence pertaining to all three factors in order to survive summary judgment. <u>See</u> <u>Navarro</u>, 261 F.3d at 100 n.6 (stating that the individualized nature of what constitutes a disability means "that the three listed factors can combine in a number of different ways, even to the exclusion of one or more of them"). Rather, it is merely a recognition that when plaintiffs present sufficient evidence as to all three factors the case is no longer "so one-sided that the movant is plainly entitled to judgment, for reasonable minds could not differ as to the outcome." <u>FHS Props. Ltd. P'ship</u>, 175 F.3d at 85.

## IV.  THE MAJORITY'S UNNECESSARY AND ERRONEOUS ANALYSIS OF "OTHERWISE QUALIFIED"

As I stated earlier, the majority's conclusion that Calef is not disabled under the ADA means that further discussion of whether Calef is "otherwise qualified" is not required. As a general rule, I do not think that it is appropriate for an appellate court to make unnecessary pronouncements about the law. I can see no good reason for deviating from this general rule here,

and therefore respectfully dissent from Part II(B) of the majority's opinion on that basis.

I also disagree with the substance of the majority's analysis of whether Calef was "otherwise qualified" to perform the "essential functions" of his job, with or without a reasonable accommodation. First, the majority incorrectly defines "essential functions." Without any citation, the majority states that it was an essential function of Calef's job to handle stressful situations "without making others in the workplace feel threatened for their safety." I respectfully object to infusing the subjective fear of the nurses and Calef's supervisor into the "essential functions" analysis. Doing so opens the door for employers to fire disabled workers because other employees say they are afraid of their disabled colleagues.

There exists a separate and distinct analysis to deal with situations where a disabled person presents a "direct threat" to the safety of coworkers. See 42 U.S.C. § 12113(b). The reason for using a separate analysis in such instances is to protect disabled people from "prejudice, stereotypes, or unfounded fear." Sch. Bd. of Nassau County, Fla. v. Arline, 480 U.S. 273, 287 (1987); see also EEOC v. Amego, 110 F.3d 135, 143 n.5 (1st Cir. 1997) (explaining that the legislative purpose of the "direct threat" analysis is to ensure that employment decisions are not based on "fears or stereotypes," but rather objective evidence such

as overt acts or threats of violence).  This is not a direct threat case.  There is no evidence that Calef was violent or threatened anyone with violence on December 6, 1996.  Nor did Gillette raise the "direct threat" argument on appeal.[16]  See Beal Bank, SSB v. Pittorino, 177 F.3d 65, 68 (1st Cir. 1999) (defenses not raised or undeveloped are waived).  I also point out that the reason Gillette gave for firing Calef was that he refused to work overtime on Sunday and failed to cooperate with his supervisor, not that he threatened anyone with harm.

The majority suggests in a footnote that our holding in Amego stands for the proposition that the subjective fear of Calef's coworkers is relevant to this case.  I do not read Amego as broadly as the majority.  The holding in Amego was limited to situations where the "risk posed to others arises in the context of a core function of the job," such as cases involving health care workers.  110 F.3d at 143-44.  In those types of cases, examining the safety of others in conjunction with whether a person is "otherwise qualified" makes sense because the core job functions are intertwined with safety concerns.  A mechanic's core job functions are not intertwined with the safety of others in the same way as a health care worker.  Therefore, the holding in Amego does not reach to this case.

_____

[16]    Gillette concedes that the "direct threat" analysis is an affirmative defense that places the burden of proof on the defendant.

The majority claims that its "otherwise qualified" analysis is "also the view of every circuit case which has addressed a similar situation under the ADA or the Rehabilitation Act." The cases from other circuits upon which the majority relies do not address the same situation we face here. In all of those cases, the plaintiff was fired because he was violent or threatened violence. See Palmer v. Circuit Court, 117 F.3d 351 (7th Cir. 1997) (plaintiff told coworker she would "kick her ass" and "throw her out of her window"); Johnson v. N.Y. Hosp., 96 F.3d 33, 34 (2d Cir. 1996) (plaintiff had "violent scuffles with security guards"); Williams v. Widnall, 79 F.3d 1003, 1007 (10th Cir. 1996) (plaintiff made threats against his supervisor and co-workers); Crawford v. Runyon, 79 F.3d 743, 744 (8th Cir. 1996) (plaintiff made threats to hurt or kill his supervisor); Adams v. Alderson, 723 F. Supp. 1531, 1532 (D.D.C. 1989) (plaintiff committed "a violent physical assault upon a female supervisor"). In sharp contrast, the parties all agree that Calef did not act violently or threaten anyone with violence on December 6, 1996. The parties also agree that Calef never had a violent incident at work after he began therapy and started taking medication.

The remaining two cases cited by the majority are from this circuit, and are also distinguishable. Reed v. Lepage Bakeries, Inc., 244 F.3d 254 (1st Cir. 2002), involved a plaintiff who, unlike Calef, failed to request a reasonable accommodation

-48-

from his employer.  This court called that failure "the fatal flaw in Reed's case."  Id. at 260.  Bercovitch involved a defendant that made numerous accommodations to the plaintiff, whereas here, Gillette refused outright Calef's requests for accommodation.  133 F.3d at 154.  In addition, the plaintiff in Bercovitch was seeking a preliminary injunction and therefore had to prove a "probability of success" that he was otherwise qualified--which is a much higher burden than Calef faces on summary judgment.  Id. at 151.

The majority's discussion of whether Calef was "otherwise qualified" troubles me for another reason.  The majority refers twice to the fact that "Calef never renewed his request to be moved to different machines."  The majority fails to understand that an employer's refusal to provide a requested reasonable accommodation is a violation of the ADA, see Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999), regardless of how many times the employee asks.  Here, Calef asked his boss for a reasonable accommodation and was "rejected out of hand."  Katz, 87 F.3d at 33.  Calef then made the same request to his boss's boss, and received the same treatment.  My concern is that employers will now be discouraged from providing an accommodation upon an employee's first request, or the second for that matter, in hopes that the employee will fail to "renew" the request.  This behavior conflicts with the purpose of the ADA, which places emphasis "on encouraging the employer to engage in an interactive process with

the individual to determine an effective reasonable accommodation." <u>Grenier</u>, 70 F.3d at 677 (citation and quotation marks omitted) (emphasis added).

## V. CONCLUSION

Calef has presented sufficient evidence from which a reasonable fact finder could, but need not, decide that he is disabled within the meaning of the ADA. This case should be remanded for further proceedings.